## Jackson, Appellant, v. The Pittsburgh Times.

[Marked to be reported.]

*Libel—Privileged communication—Malice.*

It is matter of law for the court to determine whether the occasion of writing or speaking criminatory language, which would otherwise be actionable, repels the inference of malice, constituting what is called a privileged communication; and if there is no intrinsic or extrinsic evidence of malice, it is the duty of the court to direct a nonsuit or verdict for defendant. If the communication contains expressions which exceed the limits of privilege, such expressions are evidence of malice and the case should be given to the jury: Neeb v. Hope, 111 Pa. 145.

In an action for libel, it appeared that the publication complained of was a somewhat exaggerated and sensational account of plaintiff's conduct while serving on active duty as first lieutenant in a militia regiment at Johnstown during the great flood in June, 1889, alleging that plaintiff was drunk, and while in this condition had been guilty of an unprovoked attack upon a deputy sheriff. The court affirmed a point which required an instruction that "the style and tone of the narrative exaggerate and magnify the alleged fault of the plaintiff and is evidence of malice," and left the whole case to the jury on the two questions whether the article contained a substantially fair and true account of what happened, and whether

the defendants had probable and reasonable cause to believe their statement true, and made proper inquiries and used care in what they said, believing it to be true.  *Held* not to be error.

*Comment by the court upon plaintiff's conduct.*

In such a case a statement of the court that they could not see how an officer could be more degraded than to be under the influence of liquor while on duty, was within the bounds of just judicial comment.

*Evidence in support of good faith of publication.*

Evidence that the military authorities preferred charges against plaintiff for his conduct, and that the inspection roll of his company showed that he was under arrest after the date of the publication, was properly received in support of the statements and the good faith of the published articles, although the charges and the entry in the inspection roll were after the main transaction.

*Sending out libelous publication with the jury.*

It is not error for the court to refuse to send out with the jury the libelous publication, especially where it does not appear that the court was asked to do so.

Argued Oct. 25, 1892.  Appeal, No. 214, Oct. T., 1892, by plaintiff, Joseph Jackson, from judgment of C. P. No. 1, Allegheny Co., March T., 1890, No. 622, on verdict for defendant. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Trespass for libel.

At the trial, before COLLIER, J., it appeared that the alleged libelous publications declared upon were as follows:

## A DISGRACED OFFICER.

*Lieu. Jackson in a Drunken Fury has a Desperate Struggle with a Deputy Who refuses to pass Him.*

BRANCH OFFICE OF THE PITTSBURG TIMES, JOHNSTOWN, June 5.

Down the Cambria road, past which the dead of the river Conemaugh swept into Ninevah in awful numbers, there was another scene to-day, that of a young officer of the National Guard, in full uniform, and a poor deputy sheriff, who had lost home, wife, children and all, clinched like madmen and struggling for the former's revolver.  If the officer of the guard had won there might have been a tragedy, for he was drunk.  The homeless deputy sheriff, with his wife and babies swept to death past the place where they struggled, was dead sober and in the right.  The officer of the National Guard was First Lieutenant

Joseph Jackson, Company G, Fourteenth Regiment.  His company came with that regiment in this hour of distress to protect survivors from ruffianism and maintain the peace and dignity of the state.  The man with whom he fought for the weapon was Peter Fitzpatrick, almost crazy in his own woe, but singularly cool and self-possessed regarding the safety of those left living.  It was one o'clock this afternoon when *The Times* correspondent noticed on the Cambria road the young officer with his long military coat cut open, leaning heavily for support upon two privates of Company I, Hawthorne and Stewart (boys).  He was crying, in a maudlin way, " You just take me to a place and I'll drink soft stuff."  They entreated him to return to the regimental quarters, even begged him, but he cast them aside and went staggering down the road to the line, where he met the grave-faced deputy face to face.  The latter looked into the white of his eyes and said:

" You can't pass here, sir."

" Can't pass here ! " he cried, waving his arms.  " You challenge an officer.  Stand aside."

" You can't pass here," this time as quietly.  " Not while you're drunk."

"Stand aside," he yelled.  " Do you know who I am?  You talk to an officer of the National Guard."

" Yes, and listen," said the man in front of him, so imperatively that it hushed his tirade, " I talk to an ' officer ' of the National Guard; I who have lost my wife, my children and all in this flood no man has yet described; we who have seen our dead with their bodies mutilated and their fingers cut from their hands by dirty foreigners for a little gold, are not afraid to talk for what is right, even to an officer of the National Guard."

While he spoke another great, dark, stout man, who looked as though he had suffered, came up, and, upon his taking in the situation, every vein in his forehead swelled purple with rage.

" You dirty cur," he cried to the officer, " you dirty drunken cur, if it wasn't for the sake of peace I'd lay you out where you stand."

" Come on," yelled the Lieutenant with an oath.

The big man sent out a terrible blow that would have left

him senseless, had not one of the privates dashed in between, receiving part of it and warding it off. Lieutenant Jackson got out of his military coat. The privates seized the big man, and with another newspaper correspondent who ran to the scene, held him back. The Lieutenant put his hand to his pistol pocket, then Deputy Fitzpatrick seized him and the struggle for the weapon began. For a moment it was fierce and desperate, then another private came to the deputy's assistance. The revolver was wrested from the drunken officer, and he himself was pushed back, panting to the ground. Deputy Fitzpatrick seized the military coat he had thrown on the ground, and with it and the weapon started to the regimental headquarters. Then the privates got around him and begged him, one of them with tears in his eyes, not to report their officer, saying that he was a good man when he was sober. He studied a long while, standing in the road, while the officer slunk away over the hill. Then he threw the disgraced uniform to them and said: "Here, give it to him; and mind you, if he does not go at once to his quarters, I'll take him there, dead or alive."

## THE DISGRACED SOLDIER.

*He demands and is granted an Investigation—If found guilty, He will be severely punished.*

BRANCH OFFICE OF THE PITTSBURG TIMES, JOHNSTOWN, June, 6.

Lieutenant Jackson has had his sword taken from him and he is put off all duty. Concerning the matter Colonel Perchment, of the Fourteenth Regiment, said to-day:

"Lieutenant Jackson asks for an investigation here, and I have agreed to hold one to-morrow at headquarters at 8.30 A. M. The Lieutenant says he can clear himself. If he can clear himself here, no charges for court-martial will be preferred against him. However, if he is guilty, I will punish him to the full extent of the law."

## JACKSON UNDER ARREST.

*The Disgraced Pittsburg Officer deprived of His Sword and sent Home after Investigation—Court-martial or Resignation.*

BRANCH OFFICE OF THE PITTSBURG TIMES, JOHNSTOWN, June 7.

First Lieutenant Joseph Jackson, Company G, Fourteenth

Regiment, goes to Pittsburg under arrest.   There he will either report for court-martial or withdraw from his command.   This was ordered by Colonel Perchment to-day, after hearing the evidence of F. Jennings Crute and Richard H. Davis, the two correspondents of *The Times*, who witnessed the whole of his disgraceful conflict while he was drunk and in full uniform on Wednesday with the poor deputy on the Cambria road who had lost his family and home in the flood.   The officer's escapade is considered among military men here, happening under the circumstances it did, as an insult to the whole National Guard of Pennsylvania that cannot be too quickly resented.

The officer of the Colonel's staff who crossed the river and summoned the correspondents in their tent last night met them at the regimental picket lines this morning and escorted them to Colonel Perchments private car, where he and Lieutenant-Colonel Graham were in waiting with a number of newspaper men and officers of the regiment.   The patrols to the desolate districts were just going out of camp and could be seen marching down through the valley in the distance, while the guards already held the river passes and Company G filed by with the Second Lieutenant in command.   The testimony was taken by Surgeon D. G. Foster, who wrote on the top of his bunk and administered the military oath.

"You do solemnly swear in the presence of Almighty God that your statement shall be true and one for which you are ready to answer on the last day."

Mr. Crute's dispatch to the press was sworn to and accepted as evidence, as printed in *The Times.*

Mr. Davis also witnessed the affair, and testified that he and a soldier held the citizen, who, seeing the officer was preparing to fight, was eager to renew the attack.

Lieutenant Jackson was not present.   He had scoured around and gotten several women on the river road to say he wasn't drunk.   Colonel Perchment heard their statements, and taking the evidence ordered the officer under arrest.   Speaking of the officer the Colonel said : "Lieutenant Jackson will either have to stand a court-martial or resign his commission.   One thing is certain, he can't remain in the regiment."

Defendant offered in evidence the charges and specifications preferred against plaintiff by Col. Perchment.   Objected to,

(1) that these charges furnish no justification to defendant, unless they were in the possession of defendant at the time of this alleged libel; (2) because the specifications in relation to the alleged quarrel are as follows: " In this, that First Lieutenant Jackson of Company G, 14th Regiment, and being in the uniform of First Lieutenant, did whilst intoxicated, engage in a disgraceful quarrel with one Peter Fitzpatrick in a public street in the presence of enlisted men and other people," while the proof shows that no such man as Fitzpatrick was there [the party's real name being Kelly].   Objections overruled and bill sealed. [5]

Defendant also offered in evidence the inspection roll of Company G, 14th Regiment, for the purpose of showing that at that time and continuing down to Oct. 15, 1889, Joseph Jackson is there reported as absent under arrest.

Objected to, (1) as incompetent and irrelevant; (2) because it has not been shown that defendant ever saw or heard of this before these charges were made in this alleged libel; (3) that unless it is to be followed by proof that they saw this inspection roll before making these charges in the newspaper, it can be no justification; (4) and that it has already been proved by the witnesses for the defence that he was not under arrest and never had been.   Objection overruled and exception. [6]

The court charged the jury in part as follows:

["Now, it is very clear in this case that all of the charges published in this paper are not false at all.   It is very clear that Lieutenant Jackson was in liquor.] [7] . . . .

["Was he an officer of the National Guard, was he under the influence of liquor or drunk, and did he have this trouble here?   He was not arrested—that is, literally arrested—he was relieved; and as he says himself when a man is under charges, asks for a court martial and is relieved he cannot wear his sword, because it is an emblem of his authority when he is on duty.] [8]   Did this correspondent substantially state in this article what actually occurred there—substantially, not in every word?   The law is that where a public officer is concerned the people have a right to know, particularly in times like those when they were sent there to prevent marauding and protect the po or people who were distressed beyond anything that has ever happened in our state.   Under those circum-

stances, did this correspondent in writing, to the paper do any more than to give a substantial account of what happened? Not whether the one struck first or the other, not whether they talked loud, but substantially did he state the facts of the occurrence? If he did the paper had a right to print it, and we had a right to read it. The learned counsel argued very eloquently to you that they went beyond that. That is for you to say and not for the court. He alleges that they went away beyond that, and especially that the tone of the article was malicious, and intended to further degrade the plaintiff. [Well, for my part I cannot see how an officer could be more degraded than to be under the influence of liquor while he is on duty. It is certainly not commendable, to say the least. I only say this for myself, not for the jury.] [9] . . . . Plaintiff says that he was not arrested and his sword taken from him; that these statements are not correct, and that things are put in this article which did not occur. So, you will say whether that was a fair and substantial statement of what occurred there. [The correspondent only gives what occurred there, not who was in the right or wrong in this fuss, or whether one of these men struck him first, or who began the fuss.] [10] The question is, was it a report of what happened there? And if it was a substantial account, a true and substantial account—not necessarily exact—then the defendants were justified and should have a verdict in their favor. On the other hand, if you think it was not a substantially fair account of what occurred there, then the plaintiff is entitled to a verdict, because they were bound to give a fair and substantial account. It is not necessary to be correct in every word, as I told you; that is not common sense, and could not be done; nobody could conduct a paper if that were so, but the law is that it has to be a fair and substantial account of the occurrence. . . .

["I say to you, first, that if you believe this article contained a substantially true and fair account by this correspondent of what happened up there, then the plaintiff is not entitled to a verdict, because the law of the land says that comments of that kind may be made, report may be made about public officers if they are fair, reasonably and substantially true.] [11] In the second place, if you find that the defendants had reasonable and probable cause to believe their statements true, made proper

inquiries, and used care in what they said, believed it to be true, then the paper was justified in printing it and the public had a right to read it, because it was a matter of public importance connected with a public matter of great importance and great interest at the time, and about a public officer, an officer who was there on duty at the time. On the other hand, if you do not find either of those points, the plaintiff would be entitled to a verdict, because then it would be unjustifiable and would be a libel. If you find that they were not justified on either of these grounds, then the next question is the measure of damages. . . .

" Counsel for defendant having asked to have some documentary testimony on his side go out with the jury, along with the alleged libel, and counsel for plaintiff having objected, the court refuses to send either out unless requested by the jury. Bill of exceptions sealed for plaintiff." [12]

Plaintiff's points were among others as follows:

" 2. Even if the jury believe that an altercation took place between plaintiff and a deputy sheriff as alleged in the article complained of, yet the words and language used in describing the occurrence are not justified by the evidence, and a verdict should be rendered for plaintiff." Refused. [1]

" 3. Even if the account of the transaction were correct, the style and tone of the narrative exaggerate and magnify the alleged fault of plaintiff, and is evidence of malice, [justifying a verdict for plaintiff.] *Answer:* Affirmed, except the part in brackets, which is refused." [2]

Defendant's points were as follows:

" 1. If the jury believes that the publications complained of were made on proper occasions, in a proper manner, from a proper motive, and defendant had reasonable or probable cause to believe them to be true, plaintiff cannot recover, and the verdict must be for the defendant." Affirmed. [4]

" 2. If the jury finds that the matters contained in said articles were proper for public information, and the defendant, without malice towards the plaintiff, but from good motives caused said publications to be made, and said publications were based on reasonable or probable cause, plaintiff cannot recover, and the verdict must be for the defendant." Affirmed. [3]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–4) answers to points, quoting points and answers; (5, 6) rulings on evidence, quoting bills of exception and evidence; (7–11) portions of charge as above, quoting them; (12) in refusing to permit plaintiff to send out with the jury the libelous publication.

*W. D. Moore,* with him *Thos. M. Marshall* and *F. C. McGirr,* for appellant.—The headings, tone, comments and the whole character of the articles complained of in this case deprived the publications of any claim of privilege, and the court below should so have told the jury by affirming plaintiff's second point; and this under the authority of Pittock v. O'Niell, 63 Pa. 253, where this court says: " In civil cases the court is bound to instruct the jury as to whether the publication is libelous, supposing the innuendoes to be true."

In such a case the general principle is that if the publication, considered either by itself or in connection with extrinsic facts, be defamatory, malice is an inference of law, which the jury are bound to find according to the direction of the court: Pittock v. O'Niell, 63 Pa. 253; Conroy v. Pittsburgh Times, 139 Pa. 334.

The admission of the charges embraced in the fifth specification of error was clearly erroneous. It will be seen from indorsements on the same that they were not prepared until Oct. 14, 1889, more than four months after the publication of the libel.

There was error in admitting in evidence the inspection roll of Company G. The mere fact that the roll showed that plaintiff was absent from his company under arrest, is no proof of the fact.

The remark of the court set out in the ninth assignment of error, " I cannot see how any officer could be more degraded than to be under the influence of liquor," was so uncalled for, and necessarily so prejudicial to the plaintiff's case that we deem it fit ground for reversal, under the familiar rule that while the court has the right to express an opinion on the facts, it must not go so far as to prejudice the jury against a party.

We never before heard or knew of the court refusing to let the jury have the libel out with them. In a case of this kind,

where the libel consisted principally of comments made, it was particularly necessary for the jury to have the papers in order to remember the language used, and we think it was error to refuse our request to send the papers out.

*Geo. C. Wilson,* for appellee.—Whatever the law of libel may have been in criminal cases, the rule in civil cases has always been that the truth was and is a justification: Press Co. v. Stewart, 119 Pa. 602; Brewster's Practice, sec. 527.

The merits and demerits affecting the qualifications and character of one who is a candidate for public office may be freely discussed and commented on: Briggs v. Garrett, 111 Pa. 421. This is true not only of the candidate for public office, but of him who is in its full enjoyment.

There was abundant evidence to warrant the use, by the court in its charge, of the language complained of in the seventh specification.

The part of the court's charge quoted and made the tenth specification of error, standing alone, does not indicate what the court really said or meant to say. If it be read in connection with the sentence which immediately precedes it or the sentence which immediately follows it, or with the other parts of the charge, what the court said will fully appear, and it will be seen that the plaintiff was in no wise harmed by the language complained of in that specification.

The Supreme Court will not reverse for every error that falls into a cause in the hurry of a jury trial; some substantial injury must have been the actual or probable result of such error to justify the disturbance of the judgment: Trego v. Pierce, 119 Pa. 140.

OPINION BY MR. JUSTICE GREEN, January 3, 1893:

The learned court below committed the whole case to the jury both in the general charge and in the answers to points, and the jury found a verdict in favor of the defendant.

The court distinctly said, several times, that the matter contained in the publications in controversy was libelous, and the plaintiff would be entitled to a verdict, unless the jury found that the publications contained a substantially fair and true account of what had happened, or that the defendant had reasonable and probable cause to believe the statements true,

after proper inquiries made.    The court said further : " On the other hand if you do not find either of these points the plaintiff would be entitled to a verdict, because then it would be unjustifiable, and would be a libel.    If you find that they were not justified on either of these grounds, then the next question is the measure of damages."    It is difficult to understand what more the court could have done.    The case was necessarily for the jury.    The court could not direct them absolutely to return a verdict for the plaintiff and were not asked to do so. They could not affirm the plaintiff's first point and say, without qualification, that, " the words and language used in describing the occurrence are not justified by the evidence, and a verdict should be rendered for the plaintiff," because the jury were to judge whether the words used were or were not justified by the evidence.    The great trouble with the plaintiff's case is that, in the substantial particulars of the narration, " the words and language used in describing the occurrence " were justified by the evidence.    The plaintiff was at the time a public officer, actually on duty in performing a very grave and serious public service.    Such persons are amenable to public criticism in the newspapers, without liability for libel, if there was probable cause for their comments and no proof of express malice, even though the statements are not strictly true in all respects : Briggs v. Garrett, 111 Pa. 404; Neeb v. Hope, Id. 145; Press Co. v. Stewart, 119 Pa. 584.    In the first case we said : " A communication to be privileged must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause.    When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel ; actual malice must be proved before there can be a recovery. . . . An action for libel is upon all fours with an action for malicious prosecution.    The latter is but an aggravated form of an action for libel, as in it the libel is sworn to before a magistrate.    The cases make no distinction between them."    In the course of the opinion by the present Chief Justice numerous authorities are cited in support of his conclusions.    Among them are the following : " If fairly warranted by any reasonable occasion or exigency, and honestly made, the communication is protected for the common convenience and welfare of society. . . . I

conceive the law to be that, though that which is spoken or written may be injurious to the character of the party, yet if done bona fide, as with a view to the investigation of a fact in which the party is interested, it is not libelous.  Lord ELLEN-BOROUGH in Delany v. Jones, 4 Esp. 191.  If there is probable cause it is of no consequence that the libel was malicious. . . . In case of a privileged communication probable cause is a bar to the suit: Chapman v. Calder, 14 Pa. 365."

In Press Co. v. Stewart, supra, we said: " The defendant filed what was substantially, though not perhaps in strict technical form, a plea of justification.  It alleges that the article in the 'Press' was a just and true account of the interview between its reporter and the plaintiff, and asked the court to instruct the jury that, 'if they believed that the publication complained of is a fair and true account of an interview had between the plaintiff and Mr. Cooke, your verdict must be for the defendant.'  The court declined to affirm this point, and herein we think the learned judge erred."

In Neeb v. Hope, supra, our late brother TRUNKEY said, in the opinion: "It is a matter of law for the court to determine whether the occasion of writing or speaking criminatory language, which would otherwise be actionable, repels the inference of malice, constituting what is called a privileged communication, and if there is no intrinsic or extrinsic evidence of malice, it is the duty of the court to direct a nonsuit or verdict for the defendant.  If the communication contains expressions which exceed the limits of privilege, such expressions are evidence of malice and the case shall be given to the jury."

This is precisely what the learned court below did in the present case.  They refused the fourth point of the defendant, which asked for a binding instruction for the defendant, and affirmed the defendant's three other points, which are couched in almost the exact language of this court in the opinion above referred to; they affirmed that part of the plaintiff's second point which required an instruction that " the style and tone of the narrative exaggerate and magnify the alleged fault of the plaintiff and is evidence of malice," and left the whole case to the jury on the two questions whether the article contained a substantially fair and true account of what happened, and whether the defendant had reasonable and probable cause to

believe their statements true, and made proper inquiries and used care in what they said, believing it to be true. It seems to us that nothing more than this could have been done by the court, and that the plaintiff's real cause of complaint is with the verdict. But when it is considered that the plaintiff was, at the time of the occurrence, a public officer engaged in the performance of a most serious public duty, that by his own confession and the testimony of his own witnesses, as well as those of the defendant, he was under the influence of liquor, having taken four drinks of whiskey in a very short time and was, when the occurrence in question took place, insisting on going back to the saloon to get another drink, that his commanding officer, when he heard of the matter, advised him to go home, which he did, and was out of the service for several months, that during all this time he was not entitled to wear his sword, having demanded a court-martial; that charges were preferred against him for his conduct by the proper military officers, which though never tried remained pending for a long time, and that his conduct upon the occasion in question was certainly not that of a prudent and sober person, it must be conceded that the jury may well have felt it to be their duty to find their verdict for the defendant. It is true that in some particulars the statements in the published articles were exaggerated and sensational in their character, after the reprehensible manner of many, though not all, of the newspapers of the present day, but the effect of that kind of comment was fairly left to the jury as evidence of malice, and it was their function to decide upon its effect in the cause. It seems to us that the testimony as to the preferment of charges, and the inspection roll of the plaintiff's company, was properly received, in support of the statements, and the good faith of the published articles, although they occurred after the main transaction. Nor do we see any error in the court's statement that it was very clear that the charges published were not all false, and that the plaintiff was in liquor, as these were really very proper deductions from testimony, much of which came from the plaintiff himself and which was scarcely controverted. Also the statement of the court, that they could not see how an officer could be more degraded than to be under the influence of liquor while on duty, we think was within the bounds of just judicial

comment, and certainly was not error in any legal sense, when the evidence is considered.

As to the twelfth assignment we are not referred by counsel to any authority which requires the court to send out with the jury the libelous publication, especially when it does not appear that the court was asked to do so.   There is nothing on the record upon this subject except the remark of the court that counsel for the defendant having asked to send out some document along with the alleged libel, and the plaintiff having objected to this, the court refused to send out either unless requested by the jury.   We see no error in this.

Upon the whole case we think the cause was correctly tried, the court giving every opportunity to the plaintiff to get a verdict that he could ask for, and that his want of success was due to the views of the jury as expressed in their verdict rather than to errors on the part of the court.

Judgment affirmed.