John MATHIS

v.

PHILADELPHIA NEWSPAPERS, INC. t/a The Philadelphia Daily News, Bulletin Company t/a The Evening Bulletin, KYW–TV, WPVI–TV and WCAU–TV.

Civ. A. No. 77–1067.

United States District Court, E. D. Pennsylvania.

Aug. 15, 1978.

---

Gustine J. Pelagatti, Philadelphia, Pa., for plaintiff.

Samuel E. Klein, Philadelphia, Pa., for Philadelphia Newspapers, Inc. t/a The Philadelphia Daily News.

Roberta S. Staats, Philadelphia, Pa., for Bulletin Co. t/a The Evening Bulletin.

Arthur E. Newbold, IV, Steven B. Feirson, Philadelphia, Pa., for Westinghouse Broadcasting Co. t/a KYW–TV.

## OPINION

LUONGO, District Judge.

John Mathis, a citizen of New Jersey, filed the complaint in this defamation action on March 24, 1977. Complaint ¶ 1. Jurisdiction is based solely on diversity of citizenship. 28 U.S.C. § 1332(a) (1976). The complaint names as defendants the

publishers of two Philadelphia newspapers, the Daily News and the Evening Bulletin, as well as three television stations. By stipulation, the complaint was dismissed as to two of the three television stations; the remaining defendants are the two newspaper publishers and Westinghouse Broadcasting Company, which operates KYW–TV. All three defendants now move for summary judgment. For the reasons hereafter stated, I conclude that both newspaper publishers are entitled to summary judgment, but that Westinghouse Broadcasting Company is not.

The factual record presently consists of the initial pleadings, answers to interrogatories, excerpts from depositions, admissions, and other exhibits, including copies of the allegedly defamatory newspaper articles. In addition, several affidavits are on file. Westinghouse Broadcasting Company, which operates KYW–TV, submitted the affidavits of Donald Fair and Matt Quinn, two of its reporters. The Bulletin Company submitted the affidavit of Harry Camp, one of the Evening Bulletin's police reporters. Plaintiff submitted the affidavits of Paul W. Nolan, an F.B.I. employee, and Paul Frankenfield, a Staff Inspector with the Philadelphia Police Department. Finally, Westinghouse Broadcasting Company submitted a rebuttal affidavit executed by Mr. Frankenfield.

On a motion for summary judgment, of course, the court must view the evidence in the light most favorable to the party opposing the motion. *Bishop v. Wood*, 426 U.S. 341, 347 n. 11, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). With that admonition in mind, the essential facts in this case may be summarized as follows. On January 27, 1977, the Philadelphia Daily News carried an article reporting the arrest of two men in connection with an elaborate combined kidnapping and attempted bank robbery. Exhibit E to Plaintiff's Memorandum of Law (Document No. 67). The article correctly identified the suspects as two brothers, John and Tyrone Mathis, and it included what purported to be a photograph of each man. The photograph captioned "Tyrone Mathis," however, was actually a photograph of plaintiff, John Mathis, who was neither Tyrone Mathis' brother nor a suspect in the case. On the same day, the Evening Bulletin also carried an article correctly reporting that two brothers named John and Tyrone Mathis had been arraigned on charges stemming from the kidnapping and attempted bank robbery. Exhibit I to Plaintiff's Memorandum of Law (Document No. 67). The Bulletin article, too, included what purported to be a photograph of each suspect, but the photograph captioned "John Mathis" was actually a photograph of plaintiff rather than one of the John Mathis who had been charged with the various crimes. Finally, KYW–TV, in a news broadcast that evening, ran a story on the arrests and arraignments. The broadcast included a picture of plaintiff, John Mathis, which was shown in conjunction with this story, and the announcer identified that picture as a picture of one of the suspects in the case. Additional facts bearing on these occurrences will be reviewed later in this opinion.

The complaint alleges that:

"[b]y reason of the said printing, publication and circulation of said false, scandalous, malicious, defamatory and libelous statements, . . . the Plaintiff has been brought into scandal and reproach and has been held up to odium, scorn and contempt amongst his neighbors, business acquaintances, customers and other good citizens in consequence of which the Plaintiff has suffered in his business, reputation, feelings and peace of mind to his great financial loss and damage."

Complaint ¶ 16.

Mathis seeks compensatory and punitive damages in an amount in excess of one million dollars. *Id. See generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (absent a

showing of "actual malice," private defamation plaintiff may recover compensatory damages only to the extent of his actual injury, and may not recover punitive damages).

■ Inasmuch as this is a diversity case, state law furnishes the substantive rules of decision. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Erie R. R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Neither the plaintiff nor any of the defendants has suggested that the law of any jurisdiction other than Pennsylvania might apply here. Defendants present three distinct arguments in support of their parallel motions for summary judgment: (1) Mathis cannot prevail under Pennsylvania law unless he demonstrates that defendants acted with "actual malice," and the record contains no evidence that could support a finding of "actual malice." (2) Even if Mathis could prevail on a showing of mere negligence, the record contains no evidence to support a finding that defendants were negligent. (3) The complained-of publications were privileged under Pennsylvania law and thus are not actionable. With respect to the first issue, all three defendants take essentially the same position, but it will become necessary to treat KYW–TV and the two newspaper publishers separately in considering the remaining issues. For the reasons set out in this opinion, I conclude that both newspaper publishers are entitled to summary judgment based on a common-law privilege, but that Westinghouse Broadcasting Company is not.

## THE APPLICABLE STANDARD OF CARE

Defendants argue initially that they are entitled to summary judgment because Pennsylvania law requires Mathis to show "actual malice" on their part in order to prevail. A review of the factual record, they urge, discloses no evidence at all that could support a jury finding of "actual malice," and so summary judgment in their favor is appropriate. Mathis contends, by way of response, that he need only establish *negligence* on the part of defendants in order to prevail.

■ If defendants' view of Pennsylvania law is accurate, they are unquestionably entitled to summary judgment, for the record is utterly devoid of evidence of "actual malice." In my view, however, Pennsylvania law allows a "private figure" plaintiff to recover based on a showing of negligence.

■ This sharply disputed issue of Pennsylvania law can perhaps best be viewed in the context of a series of Supreme Court decisions that have dramatically altered the common law of defamation throughout the United States. At common law, with respect to all but one [1] of the elements of an action for defamation, strict liability was the rule. *See* J. Henderson & R. Pearson, The Torts Process 847 (1975); W. Prosser, Torts § 113 at 771–75 (4th ed. 1971). In particular, a defendant was held liable for publishing a defamatory falsehood, notwithstanding that he reasonably believed it to be true. The issue of reasonable belief in the truth of the statement might come into the case if the defense of privilege was raised, but the defendant's state of mind was simply irrelevant to the plaintiff's *prima facie* case. *See* J. Henderson & R. Pearson, The Torts Process 847 (1975); W. Prosser, Torts § 113 at 771, 773 (4th ed. 1971). This rule was sharply undercut by the decision in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), where the Court held

---

1. With respect to the element of publication—*i. e.,* communication of the defamatory matter to a third person—the common law imposed "no liability for publication which the defendant did not intend and could not reasonably anticipate, as in the case of words spoken with no reason to suppose that anyone but the plaintiff would overhear them, or a sealed letter sent to the plaintiff himself which is unexpectedly opened and read by another." W. Prosser, Torts § 113 at 774 (4th ed. 1971) (footnotes omitted); *see, e. g.,* Pa.Stat.Ann. tit. 12, § 1583 (Purdon 1953), *recodified at* 42 Pa.Cons.Stat.Ann. § 8344 (Purdon Supp.1977) (effective June 27, 1978); Restatement (Second) of Torts §§ 558(b), 577(1), & 580B, Comment b (1977).

that the first and fourteenth amendments, taken together, preclude an award of damages in a defamation action brought by a *public official* to redress a defamatory statement relating to his official conduct "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. Several years later, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended *New York Times v. Sullivan* to defamation actions "instituted by persons who are not public officials, but who are 'public figures' and involved in issues in which the public has a justified and important interest." 388 U.S. at 134, 87 S.Ct. at 1980.

*New York Times v. Sullivan* was extended once again, this time to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous," in *Rosenbloom v. Metromedia*, 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296 (1971) (plurality opinion) (footnote omitted). Under Justice Brennan's *Rosenbloom* formulation, which was joined by only two other members of the Court, even a "private figure" could not recover damages absent a showing of "actual malice," so long as the defamatory statements concerned matters of public interest. The five opinions filed in *Rosenbloom* clearly indicated, however, that the Court was divided over the proper reach of *New York Times v. Sullivan*, and several years later, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court rejected the *Rosenbloom* standard in favor of a dichotomy between "public figures" and "private figures." Justice Powell wrote for the Court:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a *private individual*."
>
> 418 U.S. at 347, 94 S.Ct. at 3010 (emphasis supplied, footnote omitted).

The import of *Gertz* has been summarized in this way: "Public figures must prove actual malice to recover damages for defamatory falsehoods, but private figures may recover upon a showing of mere negligence." Note, *Public Figures, Private Figures and Public Interest*, 30 Stan.L.Rev. 157, 162 (1977). To put the matter more precisely, a state *may*, consistent with the Constitution, permit a private individual to recover damages in a defamation action "upon a showing of mere negligence." The issue here is whether Pennsylvania has chosen to do so.

Defendants urge that Pennsylvania has not, and they rely on *Matus v. Triangle Publications, Inc.*, 445 Pa. 384, 286 A.2d 357 (1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972), where the Supreme Court of Pennsylvania "specifically held that a libel action by a private individual against a media entity for a defamatory falsehood in a newscast relating to an event of [public interest] could be maintained only upon a showing of 'actual malice.' " Memorandum of Westinghouse Broadcasting Company (Document No. 49) at 2. *Matus*, however, was decided during the period after *Rosenbloom* and before *Gertz*, a period in which the Supreme Court of the United States had announced, albeit in a plurality opinion, that the Constitution *required* a showing of "actual malice" before damages could be awarded in a defamation action brought by a private individual to redress false statements concerning matters of public interest. *See* Discussion *supra*. The *Gertz* decision, handed down in 1974, removed that constitutional constraint upon state law. Thus, the question here is whether *Matus* survived *Gertz*.

No subsequent decisions of the Pennsylvania Supreme Court address this question. Defendants urge that *Matus* is still good law, in part "because there is no suggestion in the *Matus* opinion that the Pennsylvania Supreme Court embraced the 'actual malice' standard with anything but enthusiasm." Memorandum of Westinghouse Broadcasting Company (Document No. 49)

at 4. I disagree, however, as I discern no enthusiasm at all for the *Rosenbloom* standard in *Matus.* Justice Pomeroy's opinion for the *Matus* court reads in pertinent part as follows:

> "On the . . . question of extending the reach of *New York Times* to matters of public or general concern, there was no disagreement among the five members of the Supreme Court who wrote or joined in opinions in support of the judgment affirming the Court of Appeals. We therefore accept this modification of the law of defamation in Pennsylvania, and with it the corollary that in such cases the reasonable care standard must give way to the more stringent standard of [actual malice]. Specifically, we adopt as binding on us the holding of the plurality opinion in *Rosenbloom* . . . ."

445 Pa. at 395, 286 A.2d at 363 (footnote omitted).

When the Supreme Court of Pennsylvania is ultimately faced with the question whether a "private figure" plaintiff may recover for defamation based on a showing of negligence, it will have to resolve that question by drawing on the policies that traditionally have shaped the Pennsylvania law of libel and slander. Although the common-law rule of strict liability is no longer viable in light of *New York Times v. Sullivan,* I see no reason to believe that the Supreme Court of Pennsylvania, which is now free to abandon the *Rosenbloom* "actual malice" standard in "private figure"

cases, will choose to retain that standard. Nor have defendants pointed to any aspect of Pennsylvania law that would support such a prediction. Accordingly, I conclude that the *Matus* decision is no longer good law, and that a "private figure" defamation plaintiff may recover under Pennsylvania law based upon a showing of negligence.[2]

Accordingly, defendants' argument that they are entitled to summary judgment because the record contains no evidence of "actual malice" cannot carry the day.

## EVIDENCE OF NEGLIGENCE

All three defendants further contend that, even if Pennsylvania law permits recovery based on negligence, the factual record contains no evidence to support a finding of negligence, and summary judgment is therefore appropriate. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (first amendment prohibits imposition of strict liability in defamation action brought by private individual). After reviewing the record, I conclude, with respect to Westinghouse, that genuine issues bearing on the question of negligence still remain, and must be resolved by the trier of fact. With respect to the two newspaper publishers, however, I need not rule on whether the record contains sufficient evidence of negligence to withstand a motion for summary judgment. For reasons stated in a later portion of this opinion, I have determined that the various newspaper articles and photographs were

2. A majority of the jurisdictions that have faced this issue in the wake of *Gertz* have adopted the negligence standard in "private figure" cases. *See Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 560 P.2d 1216 (1977) (en banc); *Cahil v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 543 P.2d 1356 (1975); *Troman v. Wood,* 62 Ill.2d 184, 340 N.E.2d 292 (1975) (Schaefer, J.); *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied,* 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okl.1976); *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976); *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976) (en banc). *Contra, Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450 (en banc), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* 321 N.E.2d 580 (Ind.App.1974), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *cf. Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 341 N.E.2d 569, 379 N.Y.S.2d 61 (1975) (adopting gross negligence standard). *See generally* Collins & Dushal, *The Reaction of the State Courts to Gertz v. Robert Welch, Inc.,* 28 Case W.Res.L.Rev. 306, 311–28 (1978).

privileged at common law, and that both newspaper publishers are entitled to summary judgment on that ground.

### Westinghouse

Westinghouse has submitted the affidavit of Donald Fair, one of its reporters, which sets forth the following facts:

"1. On or about January 27, 1977 a banker and the members of his family were held hostage incident to a robbery attempt. When the attempt failed, two men, John and Tyrone Mathis, were arrested.

2. Westinghouse Broadcasting Company, as part of its coverage of the kidnap-robbery story, requested that the Federal Bureau of Investigation supply to it photographs of the two men who had been arrested. The FBI, pursuant to this request, supplied Westinghouse Broadcasting with two photographs, and identified the individuals in the photographs as John and Tyrone Mathis. This procedure was not unusual, the FBI having granted similar requests over the years without error.

3. The photographs and identifications supplied by the FBI were telecast by Westinghouse Broadcasting as a part of its newscast concerning the robbery attempt."

Based on the Fair affidavit, Westinghouse argues that KYW–TV's "reliance upon the FBI in the particular circumstances of this case precludes, as a matter of law, a finding of fault as [constitutionally] required by *Gertz* [*v. Robert Welch, Inc., supra*]." Memorandum of Westinghouse Broadcasting Company (Document No. 48) at 7 n.6.

Plaintiff contends, however, that summary judgment is inappropriate because a material issue of fact remains: Did Westinghouse actually obtain the photographs used in the KYW–TV newscast from the FBI? In support of this position, plaintiff filed the affidavit of Paul W. Nolan, a "member" of the FBI "assigned to the Philadelphia office in charge of bank robberies." Nolan Affidavit ¶ 1. Nolan's affidavit states that, on or about January 26, 1977, he was personally familiar "with the events and the F.B.I. investigation of the attempted bank robbery" with which the Mathis brothers were charged. *Id.* ¶ 4. It further states that, on or about the same date, the FBI arrested "at least" three persons "who were charged with a bank robbery." *Id.* ¶ 2. These three individuals—Dennis Wilson, Tyrone Mathis, and John Mathis—were then photographed with color film, which requires a week or ten days for developing. *Id.* ¶¶ 2, 3. Finally, the Nolan affidavit states:

"5. That the Federal Bureau of Investigation file did not anytime reflect the dissemination to any member of the news media, a photograph or photographs of any of these bank robbers.

6. That the Federal Bureau of Investigation file on or about January 26, 1977 and January 27, 1977 or anytime thereafter, did not contain a black and white photograph of another individual named, John Mathis.

7. That the Federal Bureau of Investigation file did not contain any name of a John Mathis appearing in their indices, [on] or about January 26, 1977 or January 27, 1977, who was living in Temby Chase Apartments, Delran, New Jersey [, where the plaintiff resides,] and was born on April 30, 1938 [, the plaintiff's date of birth]."

Westinghouse has since filed a response, in which it contends that the Nolan affidavit does not create an issue of fact as to the source of the photograph used by KYW–TV. The argument is forcefully stated in Westinghouse's memorandum:

"The Affidavit of Donald Fair, filed in support of KYW's Summary Judgment Motion, clearly states that the photograph of John Mathis broadcast by KYW was obtained from the Federal Bureau of Investigation. In *his* Affidavit, Mr. Nolan does not deny that the photograph broadcast by KYW came from the FBI. He does not state that he was solely responsible for or had control over the release of photographs. He does not even say that it is unusual for the FBI to

accommodate media requests for photographs or that it is unlikely that the FBI provided KYW with plaintiff's photograph. All Mr. Nolan really says is that the FBI file did not 'reflect the dissemination to any member of the news media, a photograph or photographs of any of these bank robbers' (Affidavit, ¶ 5). However, Mr. Nolan does not aver that FBI files always, usually, or even ever reflect the fact that the media has been provided with photographs."

Response of Westinghouse Broadcasting Company (Document No. 60) at 1–2 (footnote omitted).

■ While I acknowledge that the Nolan affidavit is scarcely a model of precision, I nevertheless conclude that it creates a factual issue regarding the source of the photograph used on the KYW–TV broadcast. To begin with, I am mindful of the general rule that affidavits filed by the party opposing a motion for summary judgment should be treated indulgently. *See, e. g., Doff v. Brunswick Corp.*, 372 F.2d 801, 804 (9th Cir. 1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed.2d 71 (1967); *Continental Aircraft Sales v. McDermott Bros. Co.*, 316 F.Supp. 232, 236 (M.D.Pa.1970). Thus, I would be reluctant to hold that paragraph 5 of the Nolan affidavit, which is plainly the focus of Westinghouse's memorandum, does not give rise to a factual issue.

Quite apart from whether FBI files ordinarily reflect the dissemination of photographs to representatives of the news media, I conclude that paragraph 6 of the Nolan affidavit independently creates a factual issue. That paragraph, placed in context and construed charitably, states that at the time of the kidnapping and attempted bank robbery, the FBI file did not contain a black-and-white photograph of plaintiff, John Mathis.[3]

True, this still falls short of a blanket averment that the FBI did *not* supply the photograph in question. It may be, for example, that the FBI file did contain a *color* photograph of plaintiff, and that this photograph was supplied to employees of Westinghouse. Or, it may be that the particular "file" that Nolan mentions did not contain a photograph of plaintiff, while *some* other file or repository did contain such a photograph. In any event, I cannot seize upon these conjectures and conclude that no factual issue exists. Westinghouse, in effect, is insisting that plaintiff "prove a negative" in order to survive this motion for summary judgment, and I cannot ignore that in appraising the affidavits submitted by plaintiff. In short, although the Nolan affidavit and the Fair affidavit *may* ultimately turn out to be consistent with one another, I hold that, at this stage of the proceedings, the Nolan affidavit gives rise to a factual issue regarding the source of the photograph used on KYW–TV's broadcast.

■ Moreover, even if plaintiff conceded that Westinghouse obtained his photograph from the FBI, a jury might reasonably find that Westinghouse's employees were negligent in relying upon the accuracy of that photograph. In every negligence case, the jury determines "what the reasonable man would have done under the circumstances." W. Prosser, Torts § 37 at 207 (4th ed. 1971); *see e. g.,* Restatement (Second) of Torts § 328C (1965) (stating the rule applicable "in any case in which different conclusions may be reached on the issue"). *See generally* James, *Functions of Judge and Jury in Negligence Cases*, 58 Yale L.J. 667, 676–77 (1941). Westinghouse could, of course, argue to the jury that the FBI's proven record of reliability in supplying information made it entirely reasonable for Westinghouse's employees to assume, in this case, that the FBI had once again supplied an accurate photograph. The crucial point here is that this argument would properly be directed to the jury, rather than to the

---

**3.** Although the precise wording used in the affidavit is that the FBI file did not contain a photograph of "another individual named, John Mathis," the context makes it clear that this means an individual, other than one of the three men taken into custody, named John Mathis. If the file did not contain a photograph of a John Mathis other than the John Mathis who was arrested, then it certainly did not contain a photograph of plaintiff.

court. I cannot say that, *as a matter of law,* Westinghouse's employees acted reasonably in relying upon the accuracy of this photograph (assuming for present purposes that it was supplied by the FBI). Accordingly, I conclude that a triable issue exists as to the negligence of Westinghouse and its employees.

In short, I must reject Westinghouse's argument that summary judgment can be granted based on the lack of evidence of negligence, for the record discloses triable issues of fact regarding (1) the source of the photograph used in the KYW–TV broadcast, and (2) the reasonableness of reliance on a photograph supplied by the FBI, if this photograph was in fact so supplied.

### The Newspaper Publishers

As I noted earlier, both Philadelphia Newspapers, Inc. (hereinafter "PNI"), which publishes the Philadelphia Daily News, and the Bulletin Company, which publishes the Evening Bulletin, also argue that they are entitled to summary judgment on the ground that the record contains no evidence to support a finding of negligence on their part. However, I have determined, for reasons stated in the following section of this opinion, that the complained-of articles and photographs published by both PNI and the Bulletin Company are privileged under Pennsylvania law, and that both newspaper publishers are entitled to summary judgment on that basis. Accordingly, I need not determine whether the record contains sufficient evidence of negligence on their part to withstand their motion for summary judgment.

### COMMON–LAW PRIVILEGE

All three defendants urge, finally, that the complained-of publications were privileged under Pennsylvania law and that

summary judgment in their favor is thus appropriate. Plaintiff vigorously opposes the motions for summary judgment, but his opposition is rooted in a misunderstanding of the applicable common-law privilege. For the reasons hereafter stated, I find that the articles and photographs published in both newspapers were conditionally privileged under Pennsylvania law, that the record contains no evidence from which a jury might find that either defendant abused the privileged, and that summary judgment in their favor is thus appropriate. With respect to the KYW–TV broadcast, however, I conclude that summary judgment in favor of Westinghouse Broadcasting Company may not be granted at this time.

The applicable privilege is set out in section 611 of the Restatement (Second) of Torts, which provides:

§ 611. Report of Official Proceeding or Public Meeting

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."

Although the Supreme Court of Pennsylvania has not yet had occasion explicitly to adopt section 611, recent decisions applying section 611 of the original Restatement of Torts, which is substantially similar,[4] fairly suggest that the new section 611 is the law of Pennsylvania. *Accord, Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 37–38, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion); *see Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 324, 275 A.2d 53 (1971); *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 177, 182, 191 A.2d 662 (1963); *Sciandra v. Lynett,* 409 Pa. 595, 600, 187 A.2d 586 (1962); *Barto v. Felix,* 250

4. Section 611 of the original Restatement of Torts provided:

"§ 611. Reports of Judicial, Legislative, and Executive Proceedings.

The publication of a report of judicial proceedings, or proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory thereof, or a

municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is

(a) accurate and complete or a fair abridgement of such proceedings, and

(b) not made solely for the purpose of causing harm to the person defamed."

Pa.Super. 262, 267, 378 A.2d 927, 930 (1977). *See generally Gilbert v. Korvette's Inc.,* 457 Pa. 602, 611–12 n.25, 327 A.2d 94, 100 n.25 (1974) ("In recent years, this Court has not hesitated to adopt sections of the Restatement (Second) of Torts (1965) when our common-law precedents varied from the Restatement or when the Pennsylvania common law provided no answer.")

Comment d to section 611, moreover, states that "[t]he filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege." That principle is of considerable importance here, for what PNI and the Bulletin Company each published was in effect a report of an informal governmental report concerning the Mathis brothers' arrest.

The articles that appeared in both the Daily News and the Bulletin on January 27, 1977, described the arrest and arraignment of John and Tyrone Mathis. As part of the narrative, each article related the name, address, and age of each suspect. Each article was accompanied by two photographs that purported to be photographs of the two suspects. In each case, however, one of the photographs was a picture of plaintiff that had been supplied by the Philadelphia Police Department. To compound the inaccuracy, the Evening Bulletin article, drawing on information supplied by the police along with plaintiff's photograph, stated that the John Mathis who had been arrested was 25 years old and lived on the 2300 block of North 30th Street in Philadelphia. Neither item was accurate with respect to the actual suspect; rather, it was *plaintiff* who, at the time his photograph was taken, was 25 years old and lived on that street. The Daily News article, however, apparently gave an accurate account of the suspect's age and address.

■ Although neither article explicitly credited law enforcement authorities as the source for all the information they contained, it is undisputed that both articles were based on information supplied by the Philadelphia Police Department and the FBI. Moreover, the photographs accompanying the articles, including the photographs of plaintiff, were supplied by the "night command" of the Philadelphia Police Department as photographs of the two men taken into custody. The "night command" is the designated source for official information regarding the activities of detectives within the Philadelphia Police Department. Camp Affidavit ¶ 3. Thus, the "night command," by releasing plaintiff's photograph to representatives of the news media, issued an informal report concerning the likeness of a criminal suspect. Defendants PNI and Bulletin Company, by republishing those photographs and reprinting information supplied along with them, in effect republished a governmental report. The complained-of publications consequently fall within the section 611 privilege.

■ Much the same may be said of the Bulletin's follow-up article, which appeared in January 28, 1977.[5] Exhibit J to Plaintiff's Memorandum of Law (Document No. 67). This article dealt primarily with the institution of criminal proceedings against a third suspect in the combined kidnapping and attempted bank robbery; it referred only briefly to John Mathis, who had been arrested the previous day. It did, however, repeat the erroneous statement of Mathis' age and address that had appeared in the first Evening Bulletin article. Accompanying this follow-up story was a photograph captioned "John Mathis," which apparently was a photograph of the John Mathis actually in custody and which, in any event, was concededly not a photograph of plaintiff.

This article, like the two earlier articles, drew on law enforcement officials, particularly FBI spokesmen, for its information.

---

**5.** Plaintiff has only recently sought to predicate the Bulletin Company's liability on this second article. In a recent submission by way of rebuttal, the Bulletin Company urges that (1) the complaint cannot fairly be read to encompass this second article, and (2) in any event, as a matter of law, the second article was not "of or concerning" plaintiff. Memorandum of Law (Document No. 74) at 6–11. I need not resolve these issues, however, in light of my conclusion that the second article was privileged under Pennsylvania law.

It described the arrest of a third suspect, summarized the initial proceedings before a United States magistrate, and incidentally repeated certain information pertaining to the two suspects arrested the day before. Thus, at least insofar as it related to plaintiff, the article was essentially a republication of an informal governmental report concerning the ongoing investigation of this crime, and it was therefore within the section 611 privilege.

The section 611 privilege is limited, however, to "accurate" reports of an official action or proceeding, and I must therefore consider whether defendants published "accurate" reports within the meaning of section 611. *See generally* Restatement (Second) of Torts § 611, Comment f (1977). In addressing that question, the complained-of-publications must be compared, not with the events that actually transpired, but with the governmental reports that defendants republished.

Without belaboring the point, I conclude that defendants' publications were accurate reports of the admittedly inaccurate governmental reports on the arrest and arraignment of the Mathis brothers. Indeed, I do not understand plaintiff to suggest otherwise. The Philadelphia Police Department reported that the photograph of plaintiff was a likeness of the John Mathis then in custody, and the initial articles in both newspapers accurately reprinted this report, which later turned out to be false. Similarly, the two articles in the Evening Bulletin accurately reprinted the obsolete account of plaintiff's age and address, as it was reported by the Philadelphia Police Department. Defendants' accounts cannot be deemed inaccurate for purposes of section 611 simply because they did not correspond to the events that actually occurred. *See Sciandra v. Lynett,* 409 Pa. 595, 600, 187 A.2d 586 (1962).

Section 611 establishes a qualified privilege only, rather than an absolute privilege. Unlike the general qualified privilege discussed hereafter, however, which (at least until *Gertz*) was lost by one who published a defamatory falsehood without reasonable ground for belief in its truth, the section 611 privilege "exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." Restatement (Second) of Torts § 611, Comment a (1977); *see* Comment, *Constitutional Privilege to Republish Defamation,* 77 Colum.L.Rev. 1266, 1269 & n.27 (1977). This privilege may still be lost through abuse, but abuse of a different kind is required:

> "[T]his qualified immunity is forfeited if the publisher steps out of the scope of the privilege or abuses the 'occasion.' This can be done by exaggerated additions, or embellishments to the account. Furthermore, this qualified privilege is lost if the defamatory material is published solely for the purpose of causing harm to the person defamed."

*Sciandra v. Lynett, supra,* 409 Pa. at 600, 187 A.2d at 589 (citations omitted).

The plaintiff bears the burden of proving abuse of a conditional privilege. Pa.Stat. Ann. tit. 12, § 1584a(1)(g) (Purdon 1953), *recodified at* 42 Pa.Cons.Stat.Ann. § 8343(a)(7) (Purdon Supp.1977) (effective June 27, 1978). Moreover, "[i]t is the duty of the court to declare as a matter of law that no abuse of the 'occasion of privilege' exists where the evidence adduced leads to but one conclusion." *Sciandra v. Lynett, supra,* 409 Pa. at 606, 187 A.2d at 592 (citations omitted).

On the present factual record, I find no evidence whatsoever that suggests any abuse of the qualified privilege. Although plaintiff alleged in his original complaint that the complained-of publications were made "for the purposes of wantonly and wickedly injuring" him, he has produced not a shred of evidence to support this allegation. Inasmuch as the section 611 privilege is not forfeited even when a publisher *knows* his words to be false, it follows that evidence of mere negligent failure to ascertain the truth of a publication, which plaintiff *has* produced, cannot raise a factual issue regarding abuse of the privilege. Under the circumstances, summary judg-

ment in favor of both newspaper publishers is appropriate.

With respect to Westinghouse, on the other hand, I am unable to enter summary judgment at the present time. As I noted earlier, in reviewing the record for evidence of negligence, a genuine issue exists as to the source of the photograph used during the KYW–TV broadcast. If, as Westinghouse contends, the photograph was actually supplied by the FBI and identified by FBI employees as a photograph of the John Mathis then in custody, the principles outlined in my discussion of the section 611 privilege would be fully applicable. As the record now stands, however, the source of that photograph is uncertain, and I therefore cannot say that the complained-of broadcast falls within the section 611 privilege as a report of a governmental report. Westinghouse is, of course, free to renew its motion upon supplementation of the factual record.

Finally, Westinghouse urges that it is entitled to summary judgment under a more general common-law privilege than the one discussed heretofore. In its brief, Westinghouse states that "[u]nder Pennsylvania law, a communication is privileged if it is made upon a proper occasion, from a proper motive, in a proper manner, and based upon reasonable or proper cause." Memorandum of Law (Document No. 48) at 8. This undoubtedly is an accurate synopsis of the general Pennsylvania common law on qualified privilege in defamation cases, as matters stood prior to *Gertz v. Robert Welch, Inc., supra. See, e. g., MacRae v. Afro-American Co.,* 172 F.Supp. 184, 187 (E.D.Pa.1959), *aff'd per curiam,* 274 F.2d 287 (3d Cir. 1960); *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 180, 191 A.2d 662 (1963); *Montgomery v. Philadelphia,* 392 Pa. 178, 182, 140 A.2d 100 (1958); *Dempsky v. Double,* 386 Pa. 542, 546–47, 126 A.2d 915 (1956); *Morgan v. Bulletin Co.,* 369 Pa. 349, 354, 85 A.2d 869 (1952); *Briggs v. Garrett,* 111 Pa. 404, 414, 2 A. 513 (1886). The "reasonable or proper cause" element of the privilege, which is especially relevant here, simply requires that "the de-

fendant had reasonable and probable cause to believe [its] statements true." *Jackson v. Pittsburgh Times,* 152 Pa. 406, 417–18, 25 A. 613, 617 (1893); *accord, McGeary v. Leader Publishing Co.,* 52 Pa.Super. 35, 48–50 (1912). Westinghouse contends that, on the factual record here, the KYW–TV broadcast comes within this general privilege as a matter of law. With this I cannot agree.

To begin with, Westinghouse's argument simply fails to take account of *Gertz v. Robert Welch, Inc., supra,* which wrought "a substantial change in the law of defamation." *Moyer v. Phillips,* 462 Pa. 395, 407, 341 A.2d 441, 446 (1975) (Roberts, J., concurring). *Gertz,* as I noted earlier, held that "liability for defamation may not be imposed without some showing of fault, amounting at least to negligence, on the part of the defendant." *Id.,* 341 A.2d at 447. Thus, "fault amounting at least to negligence on the part of the publisher" is now an element of the defamation plaintiff's prima facie case. Restatement (Second) of Torts § 558(c) (1977). In particular, *Gertz* requires as a condition of liability that the defendant was negligent in ascertaining the truth or falsity of the defamatory communication. *E. g.,* Restatement (Second) of Torts § 580B & Comments b, c, & d, § 593, Comment c, § 559, Comment d, & § 600, Comments a & b (1977). "Insofar as the truth or falsity of the defamatory statement is concerned, the question of negligence has sometimes been expressed in terms of the defendant's state of mind by asking whether he had reasonable grounds for believing that the communication was true." Restatement (Second) of Torts § 580B, Comment g (1977). Thus, as a practical matter, *Gertz* requires the plaintiff to prove that the defamatory communication was made *without* "reasonable or proper cause," and that it therefore was *not* privileged. *See Moyer v. Phillips,* 462 Pa. 395, 407 & n.4, 341 A.2d 441, 446–47 & n.4 (1975) (Roberts, J., concurring).

The post-*Gertz* status of the general qualified privilege described above is uncertain. *See generally Doman v. Rosner,* 246 Pa.Su-

per. 616, 623–625, 371 A.2d 1002, 1006–07 (1977); Restatement (Second) of Torts § 600 (1977). Assuming *arguendo,* as Westinghouse contends, that the privilege survives *Gertz* and that it protects a publication made with "reasonable or proper cause," summary judgment is still not warranted here. My earlier holding that there are triable issues of fact bearing on the negligence of Westinghouse's employees clearly precludes a finding that they had "reasonable or proper cause" for belief in the truth of the complained-of publications. Therefore, since I cannot say as a matter of law that this particular element of the privilege has been satisfied, I cannot enter summary judgment in favor of Westinghouse on the basis of this general qualified privilege.

## MOTION TO STRIKE AFFIDAVIT

■ One other matter requires a brief comment. Both PNI and The Bulletin Company have filed motions to strike the affidavit of Paul Frankenfield, which was offered by plaintiff to justify his opposition to their motions for summary judgment. *See generally* 6 Moore's Federal Practice ¶ 56.22[1] at p. 56–1330 (2d ed. 1948) ("[a]n affidavit that does not measure up to the standards of [Rule] 56(e) is subject to a motion to strike") (footnote omitted). Defendants argue that the Frankenfield affidavit was filed in bad faith, and that it contains no allegations based on personal knowledge that are relevant to the issues in this case. *See generally* Fed.R.Civ.P. 56(g) (imposing mandatory sanctions where affidavits "are presented in bad faith or solely for the purpose of delay"). After comparing the Frankenfield affidavit with the transcript of his subsequent deposition by defense counsel, I can only conclude that portions of the affidavit are affirmatively misleading, which is not to say that they were drafted with that purpose in mind. The various deficiencies in the affidavit would appear to be the result of inadequate investigation by plaintiff's counsel, rather than the product of either bad faith or dilatory purpose. Thus, the sanctions prescribed by Rule 56(g) are not warranted here.

■ As for the motion to strike, several observations may be pertinent. To begin with, only selected portions of the affidavit would properly be subject to such a motion, for the bulk of the affidavit is unobjectionable in form. Moreover, I have already granted the motions for summary judgment to which the Frankenfield affidavit was directed, and I did so without considering the allegations contained therein. As defendants point out, little in that affidavit is relevant to the controlling issues here. Under the circumstances, it would serve no purpose to strike an affidavit that, by reason of its content, was ineffectual to begin with. Defendants' numerous objections to particular allegations of the affidavit are now part of the record, and thus will be preserved in the event that the court of appeals disagrees as to the significance of the affidavit. For the time being, however, I will deny the motion to strike without prejudice to its renewal should future circumstances suggest such a course.

## CONCLUSION

For the reasons set out in this opinion, defendants PNI and Bulletin Company are entitled to summary judgment in their favor. Westinghouse Broadcasting Company is not entitled to summary judgment at this time. Finally, the motions of PNI and Bulletin Company to strike the Frankenfield affidavit will be denied.