**SUNSHINE SPORTSWEAR &
ELECTRONICS, INC., and
Albert Mosseri, Plaintiffs,**

v.

**WSOC TELEVISION, INC.; Camera
World, Inc.; Better Business Bureau of
Southern Piedmont, Inc.; Theodore G.
Law, Jr.; and Jack King, Defendants.**

Civ. A. No. 86–3207–0.

United States District Court,
D. South Carolina,
Florence Division.

July 27, 1989.

1500

John M. Leiter, Myrtle Beach, S.C., for plaintiffs.

Thomas S. Tisdale, Jr., Charleston, S.C., for Better Business & Theodore Law, Jr.

Robert T. Strickland, Columbia, S.C., for Camera World and Jack King.

Hardwick Stuart, Jr., Columbia, S.C., John H. Hasty, Charlotte, N.C., for WSOC Television, Inc.

## ORDER

PERRY, District Judge.

This matter is before the court upon the motions of the several defendants to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and in the alternative for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motions for summary judgment are granted.

### I.

### BACKGROUND OF THE CASE

Plaintiffs are Sunshine Sportswear and Electronics, Inc. (a South Carolina Corporation) and Albert Mosseri, the President and part owner of Sunshine. Defendants are WSOC–Television, Inc. (a Delaware corporation), (WSOC–TV), Better Business Bureau of Southern Piedmont and Theodore G. Law, Jr. (a North Carolina corporation and its former principal), Camera World, Inc. (a North Carolina corporation), and Jack King (a North Carolina camera merchant).

Sunshine is located in Myrtle Beach, South Carolina and is in the business of selling both retail and mail-order camera and electronic equipment. Its market area includes retail sales from locations within South Carolina and mail order sales from throughout the United States. To assist in promoting sales, Sunshine expended significant funds in advertising its merchandise on radio, on television, on billboards, in newspapers, and in national magazines.

On November 16, 1984, defendant WSOC–TV published a consumer affairs story on its 6:00 p.m. nightly television news concerning reports of alleged deceptive merchandising practices by Sunshine. These practices allegedly included advertising low prices but adding extra charges when the equipment was ordered by telephone; crediting charge cards before delivery; and using bait-and-switch tactics. The broadcast included portions of taped interviews with defendant Law who was then the President of the Better Business Bureau and with King who was a camera merchant in Charlotte, North Carolina.

Don Griffin was the reporter who appeared on the broadcast in his position as a consumer affairs reporter for WSOC–TV. Prior to the broadcast Griffin had worked as a journalist for sixteen years, as a consumer affairs reporter for ten and a half years and had been employed by WSOC–TV for five and a half years. During his career as a journalist, Griffin has prepared more than 3500 stories for broadcast or publication and approximately 2000 of these have involved matter of consumer interest. Griffin stated in his affidavit that he has relied on the Better Business Bu-

reau and Law as sources for some of his prior consumer interest stories.[1]

Griffin learned of Sunshine's alleged deceptive advertising practices from Law who provided Griffin with information about Sunshine on more than one occasion. During mid-November, Griffin investigated Law's allegations to determine whether a story was warranted.

Griffin interviewed Law to acquire information Law had regarding Sunshine's alleged deceptive merchandising practices. Law informed Griffin that complaints received by the Better Business Bureau indicated that Sunshine was not selling items at the prices it had advertised, was inflating the actual sales prices of advertised items by imposing additional charges for parts and accessories normally supplied by manufacturers as standard equipment, was debiting customer credit cards without shipping the requested merchandise, and was involved in bait and switch sales tactics. Law also informed Griffin that the Better Business Bureau had received complaints regarding Sunshine's deceptive merchandising practices and that they kept a file on these complaints. Additionally, Law informed Griffin that the North Carolina Attorney General's Office was investigating Sunshine. Law suggested Griffin contact King and other camera merchants to inquire as to their knowledge regarding Sunshine's merchandising practices.

Subsequently, Griffin interviewed King regarding his knowledge of Sunshine's business practices. King cited instances where customers were overcharged for items they received from Sunshine and where customers failed to receive merchandise ordered from Sunshine even after their credit cards had been debited for the purchase price. The information provided by King was consistent with the information Griffin had obtained from Law.

While in King's place of business, Griffin called Sunshine and attempted to purchase a camera that was shown in one of Sun-

shine's newspaper advertisements. A Sunshine employee advised Griffin that the camera was unavailable and suggested Griffin purchase a more expensive camera.

Thereafter, Griffin returned to WSOC–TV's studio and called Sunshine to obtain their comments concerning the allegations of the Better Business Bureau. Griffin spoke with Albert Mosseri, Sunshine's President and part owner. Griffin explained that allegations of deceptive merchandising tactics had been lodged against Sunshine and requested Mosseri to respond to these allegations. Mosseri denied Sunshine was guilty of any type of deceptive merchandising practices and asserted any such accusations came from other camera dealers who were upset because they could not match Sunshine's prices.

In his affidavit, Griffin states that, following his conversation with Mosseri, he telephoned the North Carolina Attorney General's Office to ascertain whether that office was investigating Sunshine. Griffin claims he spoke with Billie Miller, a consumer specialist, who informed Griffin that her office was investigating allegations regarding Sunshine's deceptive merchandising practices.

In preparing his consumer interest story on Sunshine, Griffin reviewed several of Sunshine's newspaper advertisements. He also acquired copies of a Better Business Bureau Report on Sunshine Cameras dated April 25, 1983 and a Better Business Bureau Alert dated November 15, 1984.[2] The Report explained some of the consumer complaints received by the Better Business Bureau and indicated that it had turned its files over to the North Carolina Attorney General's Office and had contacted the South Carolina Consumer Affairs Office. The Report also cautioned consumers that the "firm does not meet the business standards of [the] Bureau due to questionable advertising practices and the lack of remedial action to correct the problem both in the advertisements as well as in the sales-

---

**1.** Griffin testified that he had found the Better Business Bureau and Law to be reliable sources for prior consumer interest stories.

**2.** Law testified that documents such as the Better Business Report are routinely mailed out to members of the press.

people's sales tactics." The Consumer Alert, like the Report, detailed complaints that had been lodged against Sunshine and warned consumers that Sunshine's "advertising and marketing efforts [did] not meet the Bureau's standards since the firm [had] not corrected the pattern of using misleading advertising to lure the public into sales transactions based on deception."

Griffin testified that he proceeded with preparations to present a story on Sunshine's alleged deceptive merchandising practices only after he was convinced that the information he had obtained was true and accurate. WSOC–TV's Executive Producer Nancy McKenzie reviewed Griffin's story prior to its airing and approved the broadcast.

Griffin's story regarding Sunshine's alleged deceptive merchandising practices was broadcast by WSOC–TV during its regular 6:00 o'clock evening news telecast of November 16, 1984. The broadcast began with an introduction that "Consumers here in the Charlotte area are being warned to watch out when buying camera equipment through the mail. This involves one particular operation out of Myrtle Beach, South Carolina...." Griffin went on to say, among other things, that "Sunshine ... claims to save you lots of money, but.... according to the Better Business Bureau, it's been ripping people off." Next, Griffin discussed an advertisement Sunshine had placed in a newspaper which listed a 35 mm camera at $100 less than was the current selling price in local camera stores. A bit further in the telecast Griffin states, "... Jack King, who owns Camera World in Charlotte, says Sunshine is running a scam on consumers." King was quoted as stating that, ... "[N]o one sells a camera a hundred dollars less than cost ..." Griffin then asked, ... "[I]s this a rip-off of some kind?" King replied, "No question about it." Griffin then stated that one of King's employees had purchased a camera advertised by Sunshine for $99 but "ended up paying a lot more". Next a taped conversation between Griffin and a Sunshine employee was presented in which Griffin called Sunshine to purchase advertised items. The Sunshine employee informed Griffin that Sunshine had sold "completely out" of the advertised items but that they did have some other items available. The broadcast then switched to Law who said "[w]e understood that on Sunday, the day the ad broke, these items were unavailable." Griffin stated, "[a]ccording to the Better Business Bureau Sunshine is deceiving customers.... [i]t's an old technique known as ... bait and switch." Griffin noted during the broadcast that he had talked to Sunshine's owner, Albert Mosseri, and that he denied that Sunshine was involved in any type of bait and switch activities. Griffin also informed viewers that Mosseri claimed that Sunshine would sell merchandise at the advertised prices and that if the item was not in stock customers could obtain rainchecks.[3]

Almost two years after the broadcast, Sunshine and Mosseri filed this action. In their complaint, the plaintiffs allege as their first cause of action that the defendants damaged the reputation and business interests of the plaintiffs by making defamatory statements which were broadcast November 16, 1984 from television studios operated by defendant WSOC–TV into a "market area" serviced by the plaintiffs. As a second cause of action, the plaintiffs allege that by the above-stated actions, the defendants violated the South Carolina Unfair Trade Practices Act (UTPA) § 39–5–20, S.C.Code Annotated. The plaintiffs seek an award of actual, punitive and treble damages for the alleged wrongful acts. On December 16, 1986, the defendants removed the action to this Court on the ground of diversity of citizenship pursuant to 28 U.S.C. §§ 1332 and 1446. Defendants have moved to dismiss plaintiffs' complaint. In the alternative defendants seek summary judgment as to both causes of action.

## II.

### MOTION TO DISMISS

### STANDARD OF REVIEW

Generally, the court has broad discretion in ruling on a motion to dismiss. However,

---

**3.** A complete transcription of the broadcast is attached as an appendix to this order.

dismissal should only be granted with care in order to avoid improperly denying plaintiff the opportunity to have his claim adjudicated on the merits. In determining whether to grant a Rule 12(b)(6) motion to dismiss, this court's inquiry is directed to whether the allegations of the complaint state a claim showing that the pleader is entitled to relief. F.R.Civ.P. 8(a)(2). Also, in considering a motion to dismiss, the court accepts as true all well-pled allegations of the complaint and construes them in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). As a rule, a complaint will be deemed insufficient only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court notes, however, that a 12(b)(6) motion which raises an affirmative defense and requires a consideration of matters outside of the pleading must be treated as a motion for summary judgment. *Mims v. Kemp*, 516 F.2d 21 (4th Cir.1975).

## MOTION TO DISMISS PLAINTIFFS' FIRST CAUSE OF ACTION

In their respective motions to dismiss the plaintiffs' first cause of action pursuant to 12(b)(6), defendants Better Business Bureau, Law, Camera World, and King assert that the plaintiffs failed to "commence" this action within two years of the alleged tort, as required by the South Carolina Code. Since the plaintiffs and defendants ask this court to consider affidavits and exhibits and matters generally outside of the pleadings, the court is compelled to judge this motion by the standards set forth in F.R.Civ.P. 56. *Mims v. Kemp, supra.* Hence, defendants' motions to dismiss based on the statute of limitations will be addressed subsequently along with defendants' other arguments.

## MOTION TO DISMISS PLAINTIFFS' SECOND CAUSE OF ACTION

Defendants move to dismiss plaintiffs second cause of action. Defendants contend that the plaintiffs have stated an action which is not within the intended embrace of the South Carolina Unfair Trade Practices Act, (UTPA). See S.C.Code §§ 39-5-10 *et seq.*

Defendants Camera World and King assert that the complaint does not allege any acts which fall within the statutory definitions of the terms "trade" and "commerce." Those terms are defined by a 39-5-10(b) to:

> include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State.

In opposition, the plaintiffs contend that § 39-5-10 of the South Carolina UTPA, which defines "trade" or "commerce" is illustrative and not exhaustive of the activities to which the act applies. The plaintiffs emphasize the word "shall" in the section does not exclude activities not listed therein. Hence, the plaintiffs contend that the alleged wrongful acts of the defendants constitute activities which fall within the embrace of the South Carolina UTPA.

Defendants Camera World and King join defendants Better Business Bureau, Law and WSOC–TV in asserting that South Carolina courts have limited the reach of the South Carolina UTPA to the exclusion of the plaintiffs' claim. In *Noack Enterprises v. Country Corner Interiors of Hilton Head Island, Inc.*, 290 S.C. 475, 351 S.E.2d 347 (Ct.App.1986), *(cert. denied,* 294 S.C. 235, 363 S.E.2d 688 (1987) the defendants argue that the South Carolina Court of Appeals deemed the South Carolina UTPA inapplicable to private acts which have no impact upon the public interest. Hence, the defendants assert that the action should fail as it does not allege a proper factual basis for relief.

In opposition, plaintiffs argue that the defamatory act complained of is a private cause of action with an "impact on the public interest". Plaintiffs assert that the "deliberate and recklessly untrue" statements of the defendants in this case have or were intended to deceive the public and therefore impacted on the public interest. The plaintiffs liken the facts of this case to *State ex rel. McLeod v. C & L Corporation*, 280 S.C. 519, 313 S.E.2d 334 (1984), wherein the South Carolina Court of Appeals considered *inter alia* a party's burden of proof under the South Carolina UTPA. In that case, the Court of Appeals held that the common law elements of deceit need not be proved by one establishing a violation of the UTPA. Instead, the Court of Appeals held that one need only show that an act had the capacity or effect or tendency to deceive. *Id.* 313 S.E.2d at 338. On this authority, the plaintiffs pray that the respective motions to dismiss their second cause of action be denied.

This court finds that the scope of the South Carolina UTPA is limited to "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as provided by § 39–5–20 of the S.C.Code Annotated; and the definitions of the terms "trade" or "commerce" at § 39–5–10, *supra*, though illustrative of several acts intended to fall within the embrace of the South Carolina UTPA, do not include the alleged defamatory act complained of in this case.

This court further finds that, given the limited scope of the South Carolina UTPA, the question of whether the defamation complained of had an adverse "impact upon the public interest" need not be considered at this time. Since the conduct complained of in this case cannot be said to fall within the South Carolina UTPA's intended embrace, this court need not reach the questions presented by *Noack* and *State ex rel. McLeod, supra.* For the reasons stated herein, this court finds that the plaintiffs' second cause of action fails to state a claim upon which relief may be granted. F.R. Civ.P. 12(b)(6).

## III.

## SUMMARY JUDGMENT

### STANDARD OF REVIEW

In determining whether to grant a motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure the court must view the facts and other evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Charbonnages De France v. Smith*, 597 F.2d 406 (4th Cir.1979). Summary judgment is appropriate only when the record before the court demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law Fed.R.Civ.P. 56(c). *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party has the burden of showing the absence of a genuine issue of material fact. *United States v. Diebold*, 369 U.S. at 655, 82 S.Ct. at 994. Rule 56(e) provides that a party opposing a properly supported motion for summary judgment may not rest on the mere allegations of his pleading but must set forth or point to specific facts showing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Summary judgment occupies a position of great importance in libel actions as compared with other civil actions, due to the possible chilling effect on constitutionally protected speech which would result from the defense of defamation claims. *Peeler v. Spartanburg Herald–Journal Division of the New York Times Company*, 681 F.Supp. 1144, 1146 (D.S.C.1988). In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court noted the danger that

would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true, and even though it is in fact true, because of doubt whether it can be so proved in court or fear of the expense of having to do so. They tend to make only state-

ments which 'steer far wider of the unlawful zone.' *Id.* at 279, 84 S.Ct. at 725.

Courts have expressed a preference for the dismissal by summary judgment of libel cases in order to prevent all but the strongest cases from proceeding to trial. *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947 (D.D.C. 1976). *See Washington Post Co. v. Keogh*, 365 F.2d 965, (D.C.Cir.1966); *cf. McClain v. Arnold* 275 S.C. 282, 270 S.E.2d 124 (1980).

## CONSTITUTIONALLY PROTECTED OPINION

■ As one basis for summary judgment, defendants argue the statements complained of in the broadcast are constitutionally protected statements of opinion.[4] If the statements that the plaintiffs complain about are expressions of opinion rather than declaration of fact, then they are protected under the First Amendment and judgment should be entered for the defendants. *Potomac Valve & Fitting Inc. v. Crawford Fitting Company*, 829 F.2d 1280 (4th Cir.1987).

■ In *Potomac Valve*, the Fourth Circuit Court of Appeals set forth a two part test involving a consideration of four factors to determine whether a defamatory statement is one of fact or opinion. Drawing heavily from *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), the Court of Appeals stated that the threshold inquiry is whether the challenged statement can be characterized as true or false. If the statement cannot be so characterized, it is not actionable, but if the challenged statement can be so characterized, then three additional factors must be considered to determine whether the statement is nevertheless an opinion because "a reasonable reader or listener would recognize its weakly substantiated or subjective character and discount it accordingly." *Potomac Valve* at 1288. These additional factors are the speaker's choice of words; the context of

the challenged statement within the writing as a whole; and the broader social context into which the statement fits. *Id.* at 1287–1288.

■ Plaintiffs contend that the terms "scam" and "rip-off" which are attributed to defendants, Camera World, King, and WSOC–TV and the term "bait and switch" which is attributed to WSOC–TV, Law and the Better Business Bureau have ascertainable meaning and can be identified as either true or false. The court agrees.

These words were neither hyperbolic nor incapable of precise meaning so as to alert viewers of the broadcast that the defendants' statements were something other than factual declarations. When these statements are viewed in the context of the broadcast as a whole, the court concludes that the statements relay to the average viewer that the defendants have access to knowledge confirming that the plaintiffs have engaged in some course of wrong doing. Finally, when the statements are examined in the broader social context, it is apparent that the viewer is not made aware that the defendants' statements regarding the plaintiffs are protected opinions. To the contrary, the broadcast appears to be an investigative news report, meant to relay factual information to the audience. The court concludes that the challenged statements are not constitutionally protected statements of opinion.

## PUBLIC FIGURE

As another basis for summary judgment, defendants contend that plaintiffs were public figures as a result of their extensive advertising. Further, the defendants contend that the plaintiffs, as public figures, have failed to present evidence of actual malice. The court agrees.

■ Public figures may not recover in a defamation action absent clear and convincing proof of actual malice or of reckless disregard of the truth on the part of the speaker or publisher of the false state-

---

**4.** The Court notes Mosseri's claim derives exclusively from his identification as the owner of Sunshine. Accordingly, all defendants' arguments are meant to apply to both Sunshine and Mosseri. Likewise, the court's analysis is meant to apply equally to Sunshine and Mosseri.

ments. *New York Times v. Sullivan, supra. Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), *cert. denied* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

■ Whether or not a plaintiff is a public figure is a question of law for the court to decide. *Roenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In *Gertz,* the United States Supreme Court described two types of public figures, an individual of "pervasive fame or notoriety" who is a public figure for all purposes and an individual who "voluntarily injects himself or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues." *Id.* 418 U.S. at 351, 94 S.Ct. at 3013.

In *Gertz,* the Supreme Court also considered the plaintiffs access to the media, reasoning that a party with media access would have more of an opportunity to mitigate any damage caused by being defamed. Private individuals are entitled to greater protection because they have less access to the media and, therefore, less opportunity to mitigate their damages, therefore, they are entitled to greater protection. *Id.*

In the *National Foundation for Cancer Research v. Council of Better Better Business Bureaus,* 705 F.2d 98 (4th Cir.1983) *cert. denied* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983), the Fourth Circuit applied *Gertz* to assist in determining whether the National Foundation for Cancer Research was a public figure. The court examined the activity of the Foundation and held that where it had "thrust itself into the public eye" by aggressively seeking the public's attention through extensive advertising and solicitation campaigns, the Foundation was a public figure. *Id.* at 101.

The court also considered the dicta in *Gertz* concerning the necessity of a preexisting public controversy. The court determined that it had to examine all the plaintiff's actions in context and that there was nothing to preclude the court from finding that the plaintiff itself had created the relevant public controversy. *National Foundation for Cancer Research* at 101. *See also Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 273–74 (3rd Cir.1980).

■ Plaintiffs here insist that they have not created a controversy. However, the court disagrees. During the two years prior to the broadcast plaintiffs advertised extensively. In fact they expended over $660,000 in advertising.[5] Through their extensive advertising, the plaintiffs engaged the public's attention and therefore, assumed the accompanying risk.[6] Just as the plaintiffs had the means to conduct their advertising campaigns, they could have used the same means to refute any criticism they received from the defendants. Accordingly, the court concludes that the plaintiffs were public figures with regard to the controversy surrounding the broadcast. *See Steaks Unlimited, National Foundation for Cancer Research,* and *Gertz.* Mosseri is also a public figure. He must "share in the limelight" of the public controversy since his claim derives entirely from his relationship with Sunshine. *See WTSP–TV v. Wickes,* 11 Med.L.Rptr. 1543, 1544, (Fla.Cir.Ct.1985).

### ACTUAL MALICE

■ In order to defeat a properly supported motion for summary judgment, a public figure libel plaintiff "must present affirmative evidence" from which a reasonable jury could find with convincing clarity that the challenged publication was made with "actual malice." *Anderson v. Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2515; *cf. Peeler v. Spartanburg Herald Journal,* 681 F.Supp. 1144, 1147 (D.S.C.1988). Actu-

---

**5.** For the fiscal year ending October 31, 1984, Sunshine expended $311,556 on advertising and for its fiscal year ending October 31, 1983 Sunshine expended $348,934. The information was provided by Sunshine's accountant as well as from Sunshine's tax returns.

**6.** The third Circuit in *Steaks Unlimited,* found that there were two important considerations in

deciding when one was a public figure. First, the court must decide whether one has access to the media, and second the court must decide whether one has "effectively ... assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention." *Id.* at 273.

al malice has been defined as knowledge that the defamatory statement was false or was made with reckless disregard of whether it was false. *Scott v. McCain*, 272 S.C. 198, 250 S.E.2d 118 (1978). *See also St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

The actual malice standard against which the defendants' conduct must be measured is subjective since it makes an issue out of the publishing defendant's state of mind. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). If a plaintiff fails to meet the standard necessary to prove actual malice, Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment" for the defendant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The question before the court is whether a genuine issue has been brought forward by the evidence of record such that a rational finder of fact might find actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby*, 477 U.S. at 255–256, 106 S.Ct. at 2513–14 (1986).

As to WSOC–TV, the plaintiffs point to various instances which they claim establish WSOC–TV's knowledge and reckless disregard of the truth or falsity of statements in the broadcast attributed to WSOC–TV. Plaintiffs' first contention involves Billie Miller of the North Carolina Attorney General's Office. Griffin stated that he contacted Miller during his investigation and that she confirmed that her office was investigating the plaintiffs. During Miller's deposition, which was taken in 1988, she testified that she could not recall whether she had talked with Griffin or not. Plaintiffs assert that Miller's inability to remember whether she spoke with Griffin is evidence of actual malice. The court disagrees.

The evidence before the court reveals that Miller did not testify that she did not speak with Griffin, rather, she testified she could not remember a brief conversation that would have taken place four years prior to the taking of her deposition. In fact, Miller testified that the North Carolina Attorney General's Office was indeed conducting an investigation of Sunshine during the time period that the telephone conversation would have taken place and that if she had spoken to Griffin she would have informed him about the investigation.

Griffin, however, was under no obligation to confirm the existence of any such investigation. He could easily have relied on a single source in preparing his story for the broadcast. *See Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1320 (7th Cir.1988). In *Saenz*, the court stated that in the absence of "strong indicators of probable falsity or unreliability" reliance on a single source does not constitute actual malice. *Id.* at 1320. In any event, the evidence in this case indicates that Miller was only one of several sources that Griffin utilized in preparation for the November 16, 1984 broadcast.

Another assertion made by the plaintiffs concerns how Griffin obtained copies of the Better Business Bureau Report and Consumer Alert. Griffin stated in his affidavit that Law provided him with copies of these documents. In his deposition, Law testified that he gave the Report to Griffin and that these types of documents are routinely mailed out to the media. Additionally, the court notes that no one contests that Griffin had both of these documents in his possession and that he relied on them in preparing his story. Upon the court's review of the evidence, it finds that no issue of fact exists regarding how Griffin obtained these documents.

Finally, plaintiffs assert that actual malice is shown because Griffin used King as a source for his story. Specifically, plaintiffs contend that since King was a competitor he was a biased source and any reliance by Griffin on information King provided is evidence of actual malice. The court disagrees.

A publisher's failure to make an independent investigation of a story, even when the publisher is aware of the possible bias of its source, does not amount to reckless disregard in the absence of serious doubts about the story's truthfulness. *St.*

*Amant v. Thompson, supra.* Thus even if Griffin had relied exclusively on King's information in preparing his story, this would not in itself prove actual malice.

■ As to WSOC–TV, the court finds, in view of the record before it, that a reasonable juror would not conclude that the defendant, WSOC–TV, was reckless in its disregard for the truth or falsity of the information it broadcast concerning the plaintiffs. Since, the court finds no evidence of actual malice, and having already determined that the plaintiffs are limited public figures, WSOC–TV's motion for summary judgment is granted.

■ As to King, the plaintiffs argue that the evidence establishes that King, acting on behalf of Camera World, entertained serious doubts as to the truth of his statements. Plaintiffs contend that King ignored information which contradicted his charges against the plaintiffs. Plaintiffs direct the court to two letters that plaintiffs contend King received prior to the broadcast. One letter dated November 1, 1984 was from the North Carolina Attorney General's Office. Plaintiffs cite the court to the portion of the letter which states that the North Carolina Attorney General's review of the file showed "no significant evidence" that would constitute enough proof to make a case against the plaintiffs. The other letter, dated March 10, 1983, is from Syd Crim of the State Newspaper to John Jackson another camera dealer. King possessed a copy of this letter. The letter indicated that Crim had "encountered no evidence of bait and switch" in his dealing with the plaintiffs. King forwarded a copy of this letter to Law with the annotation, "... Would you send Mr. Crim some real consumer activity?"

The court has reviewed both letters and finds that they do not provide the basis for a finding of malice. The letter from the North Carolina Attorney General's Office indicated it did not doubt King's complaints but that it had no evidence at that time to substantiate the claims. Further the letter says it will keep the file open. Hence the court does not find that this letter provides the court with evidence of actual malice.

As to the letter from Crim to Jackson, King's annotation must be read in context. The evidence indicates that some photographers from the *Sun News* had gone to Sunshine and had purchased advertised items at the advertised prices. King testified that when the *Sun News* sent their photographers to purchase advertised items they would not be subjected to the same tactics as other consumers. Accordingly, King testified when he made the annotation on Crim's letter he meant that he and Law would have to send Crim examples of instances where consumers other than local photographers, who might be recognized by Sunshine's personnel, had experienced problems when attempting to purchase advertised merchandise. The court finds that the second letter does not provide evidence of actual malice.

■ Additionally, the plaintiffs assert that actual malice is shown because Griffin referred to a purchase made by one of King's employees as a recent purchase when in fact the purchase occurred almost 21 months prior to the broadcast. Plaintiffs contend King knew the purchase was not recent and that any complaint regarding this purchase had been resolved.

The court finds no merit in this argument since the record does not provide evidence indicating that King knew when the purchase occurred or that it had been resolved.

■ As to Law and the Better Business Bureau, plaintiffs contend that the record contains evidence from which a jury could find actual malice by clear and convincing evidence. Plaintiffs assert that disputes of fact exist as to whether Law had information prior to the broadcast that indicated plaintiffs were not engaged in the merchandising practices complained of by Law during the broadcast, whether Law forwarded complaints to the plaintiffs for resolution, and as to whether Law actually received numerous complaints regarding the plaintiffs' merchandising practices. Plaintiffs contend that these disputes of fact raise issues as to Law's subjective state of mind when he made his remarks regarding the plaintiffs during the broadcast.

Here, plaintiffs have not denied that complaints were made, they simply request the court to discount them because of their source. Plaintiffs contend that many of the complaints received by Law and the Better Business Bureau were from King, a competitor, and his employees. Plaintiffs appear to infer that a since King was a competitor he had no right to complain. Even if the court discounts complaints lodged by King and his employees, however, there were still complaints from other consumers regarding Sunshine's merchandising practices.

As to plaintiffs' contention regarding whether the Better Business Bureau forwarded all complaints it received to the plaintiffs, the court finds no disputed issue of fact. Law admitted during his deposition that he did not forward all of the complaints he received regarding the plaintiffs' merchandising practices to the plaintiffs for a response.

Finally, the court finds no evidence that shows that Law was aware prior to the broadcast that plaintiffs were not involved in deceptive merchandising practices. If Law received any information that indicated that the plaintiffs were not involved in the types of merchandising practices mentioned on the broadcast, it appears Law discounted the information since he testified that he believed the plaintiffs were involved in deceptive merchandising practices.

## NEUTRAL REPORTAGE

▮ Defendant, WSOC–TV contends it is entitled to summary judgment based on the principle of neutral reportage. In *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied sub nom. Edwards v. New York Times Co.*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), the Second Circuit explained a constitutional privilege of neutral reportage under which a republisher who accurately and disinterestedly reports certain defamatory statements made against public figures is shielded from liability, regardless of the truth or falsity of the accusations. *Barry v. Time*, 584 F.Supp. 1110, 1123 (N.D.Cal.1984); *see also Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). In *Edwards* the Court stated that "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming the responsibility for them." *Edwards* at 120. However, in order to be protected by the principle of neutral reportage, a publisher must not espouse or concur in the charges made by others and must not deliberately distort these statements to launch a personal attack of his own on a public figure. *Id.* at 120.

▮ Defendants, Law and King claimed that the plaintiffs in this action were engaged in deceptive merchandising practices. Griffin's affidavit establishes that the broadcast in question presented an accurate representation of these defendants' positions.[7] The evidence indicates that WSOC–TV did not embellish or distort these defendants' positions. To the contrary, WSOC–TV presented plaintiffs' response to the allegations that were lodged against them, further evidencing the neutrality of the broadcast. *See Barry v. Time, Inc., supra* at 1127 (N.D.Cal.1984).

The Court concludes that WSOC–TV is protected by the privilege of neutral reportage.

## STATUTE OF LIMITATIONS

Defendants Better Business Bureau, Law, Camera World, and King submit as another basis for summary judgment as well as a basis for dismissal that the plaintiffs' action is barred by the statute of limitations. Specifically, the defendants claim that the plaintiffs have failed to

---

**7.** The court notes that it views the Better Business Bureau as a responsible prominent organization with a respective independent voice within the community. The Court notes the Better Business Bureau has a reputation for impartiality. *See Better Business Bureau of Metropolitan Houston v. Medical Directors, Inc.*, 681 F.2d 397, 399 (5th Cir.1982). The Court also finds King's views regarding the plaintiffs newsworthy. *See Barry v. Time, Inc., supra.*

"commence" this action within two (2) years of the alleged tort, as required by the South Carolina Code.

A federal court sitting by diversity must follow state law in determining when an action is "commenced" for purposes of tolling a statute of limitations. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1978); *see Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949). South Carolina law provides that the statute of limitations governing causes of action for libel and slander requires such an action to be commenced within two years from the date it accrues. S.C.Code Ann. § 15–3–550; *Austin v. Torrington Co.*, 611 F.Supp. 191 (D.C.S.C. 1985).

Rule 3(a) of the South Carolina Rules of Civil Procedure dictates that a civil action is "commenced" in South Carolina state courts by "filing and service of a summons and complaint." Rule 3(b) further provides:

> For the purpose of tolling any statute of limitations, an attempt to commence an action is equivalent to the commencement thereof when the summons and complaint are filed with the clerk of court and delivered for service to the sheriff of the county in which the defendant usually or last resided, or if a corporation be defendant, to the sheriff of the county, in which any person designated by statute to accept service usually or last resided …

The rule also requires that actual service be accomplished within a reasonable time.

In the instant action, the moving defendants concede that the plaintiffs "filed" a summons and complaint with the Clerk of the Court of Common Pleas for Horry County on November 12, 1986, within the time period prescribed by § 15–3–550. However, the defendants maintain that personal service of the pleading was not effected upon them pursuant to S.C.R.Civ.P. 3(a) until after November 16, 1987, the calendar date on which the statute of limitations ran. The defendants further deny that the statute of limitations was tolled pursuant to Rule 3(b) by the plaintiffs' delivery of the respective summons and complaints to the offices of North Carolina Sheriffs. Defendants argue that 3(b) is only applicable if a defendant's whereabouts are unknown.

In opposition, the plaintiffs argue that their delivery of summons and complaints to the offices of two North Carolina Sheriffs for service upon the defendants, on or before November 17, 1987 was proper under S.C.R.Civ.P. 3(b). Plaintiffs contend that since the two year statute of limitations ran on Sunday, November 16, 1986, they were entitled to commence their action until the end of Monday, November 17, 1986. S.C.R.Civ.P. 6(a). The court agrees with plaintiff's contention. Plaintiffs also assert that Rule 3(b) only requires that a defendant be "absent" without any regard to whether a defendant's whereabouts are known or in doubt.

Plaintiffs further argue that in the case of defendants' absence from the state, a plaintiff should only be charged with good faith effort to establish the foreign country of residence for the defendants and with effecting delivery of the summons and complaint to the sheriff thereof. These contentions without more, are sufficient for this court to reach a decision.

Upon consideration of the memoranda and oral arguments presented on the issues, as well as the affidavits and exhibits submitted, the court finds pursuant to S.C. R.Civ.P. 12(b) and 56 that the suit was timely commenced. The court finds that personal service of the summons and complaint in this action was not effected until after November 17, 1986 and that was the date on which the statute of limitations ran. However, the court also finds that Rule 3(b) of the South Carolina Rules of Civil Procedure tolls the statute of limitations where, as in this action, the plaintiff timely delivered the respective summons and complaint to the Sheriff of the county in which the defendant usually or last resided.

## CONCLUSION

In sum, defendants have presented a variety of reasons that they contend entitle them to dismissal of the action or in the

alternative summary judgment. The court has reviewed the pleadings, the memoranda and arguments of counsel and now enters the following ruling on pending motions.

1. Defendants' motions to dismiss plaintiffs' second cause of action based on the the South Carolina Unfair Trade Practices Act is granted.

2. The Motions of defendants, Law, the Better Business Bureau, King, and Camera World to dismiss, or in the alternative, for summary judgment based upon the statute of limitations are denied.

3. The motions of defendants, Law, the Better Business Bureau, King, Camera World, and WSOC–TV for summary judgment, on the basis that the plaintiffs are public figures and have failed to show actual malice are granted.[8]

IT IS SO ORDERED.

Columbia, South Carolina

June 28, 1989

### APPENDIX

Bill Walker: Consumers here in the Charlotte area are being warned to watch out when buying camera equipment through the mail. This involves one particular operation out of Myrtle Beach, South Carolina and Action Nine Consumer Reporter Don Griffin has more on it tonight.

Don Griffin: Bill, the store is called, uh, Sunshine Cameras. It claims to save you lots of money, but according to the Better Business Bureau, it's been ripping some people off.

35 mm camera are in big demand nowadays. This Nikon FG is a hot seller at around $289 in most local camera stores. But this newspaper ad claims you can buy the same camera for $100 less.

Sunshine Cameras of Myrtle Beach, South Carolina also says it will sell you this Canon AE–1 Program for $198 ... a savings of almost thirty bucks. But Jack King, who owns Camera World in Charlotte, says Sunshine is running a scam on consumers.

Jack King: Uh, no one sells a camera a hundred dollars less than cost and loses a hundred dollars on it.

Don Griffin: So what's happening here, is this a rip-off of some kind?

Jack King: No question about it.

Don Griffin: King says one of his employees recently purchased a camera from Sunshine advertised at $99, but ended up paying a lot more.

Jack King: They paid $20 for a U.S. warranty, which comes with the camera, and $10.75 for mailing, shipping, and handling. Total $130.

Don Griffin: King says the price would have been the same if the camera had been purchased from a local camera store. I telephoned Sunshine Cameras in Myrtle Beach to order the Nikon FG. Here's what I was told:

Sunshine personnel: Yeah, the phones have been just jumping from Charlotte, Raleigh, up in that area, and we just sold completely out.

Don Griffin: How long will it take you to get one in?

Sunshine personnel: Well, that's what I was saying, we expect some more in in about 10 days.

Don Griffin: Ten days. Okay. What about the Canon AE–1 Program for $198?

Sunshine personnel: Yes. I have some Canon Al–1s left, but I do not have any AE–1s left.

---

8. Defendants have asserted as additional grounds for granting summary judgment in their favor (1) that the statements are substantially true, (2) that the defendants made no defamatory statements of and concerning the plaintiffs, (3) that the statements are qualifiedly privileged, (4) that plaintiffs have not suffered any damage by reason of the publication of the statement, and (5) the defense of laches. Additionally, Camera World argues that King was not acting as its agent at the time of the broadcast. Because of the disposition of the matter as set forth above, these arguments are not addressed other than to announce that none of them are deemed meritorious.

Don Griffin: No AE–1s either, huh?

Ted Law: We understand that on Sunday, the day the ad broke, these items were unavailable.

Don Griffin: According to the Better Business Bureau, Sunshine is deceiving consumers. The BBB believes Sunshine never had the cameras in stock and, if it did, never intended to sell them at giveaway prices. It's an old technique know as … bait and switch.

Ted Law: They know that if they can do it properly, they can switch you to one of their higher-priced items, away from the one advertised, and you may walk out thinking you really got a good deal. Where the only purpose of putting that ad in the paper, John, was to get you in and then say, "Gee, I'm sorry, that's a demonstration unit only, and we can't sell it to you."

Don Griffin: I talked with Sunshine's owner, Albert Mosseri, on the phone and he denies they are bait and switching consumers. He says camera dealers here are just upset because he can beat their prices. And he says he will sell cameras· at the advertised price if you place an order. It's like the old raincheck routine.

Meg MacDonald: Yes, that was my question. I guess that would be the true test, if they offer rain checks for those low-priced cameras.

Don Griffin: Well, they claim to offer rainchecks. That's to be seen, though.

Meg MacDonald: Good, Don, thank you. Interesting.