NO. 4-95-0979

                         IN THE APPELLATE COURT

                               OF ILLINOIS

                             FOURTH DISTRICT

DOUGLAS GIST,                           )  Appeal from 

          Plaintiff-Appellant,          )  Circuit Court of 

          v.                            )  Macon County

MACON COUNTY SHERIFF'S DEPARTMENT,      )  No. 95L165

          Defendant,                    )

          and                           )

DECATUR HERALD AND REVIEW, a Division   )  

of Lee Enterprises, Inc. and TCI        )  Honorable

CABLEVISION OF DECATUR,                 )  John K. Greanias,

          Defendants-Appellees.         )  Judge Presiding.

          JUSTICE STEIGMANN delivered the opinion of the court:

          In March 1995, plaintiff, Douglas Gist, sued defen-

dants, the Decatur Herald and Review (Decatur Herald), TCI

Cablevision of Decatur (TCI), and the Macon County Sheriff's

Department for defamation.  Plaintiff based his suit on a Crime

Stoppers' "Most Wanted Fugitives" flyer which the sheriff's de-

partment compiled and the Decatur Herald distributed.  TCI

produced a television segment based upon this flyer.  In August

1995, the trial court granted motions to dismiss filed by the

Decatur Herald and the sheriff's department.  In November 1995,

the court granted TCI's motion to dismiss.  Plaintiff appeals,

arguing that the trial court erred by granting Decatur Herald's

and TCI's motions to dismiss.  We affirm.

                              I.  BACKGROUND

          Plaintiff's complaint--which the trial court dismissed

--alleged essentially the following.  On August 1, 1994, the

Macon County State's Attorney filed a complaint charging plain-

tiff with burglary to a motor vehicle.  On that same day, the

trial court issued a warrant for plaintiff's arrest.  However,

the warrant was never served on plaintiff.  On October 26, 1994,

plaintiff spoke with someone from the sheriff's department about

the outstanding warrant, and a "no-charge" was issued. 

(Plaintiff's counsel was unable to explain to this court what a

"no-charge" is, and we have no independent knowledge of such a

creature in the law.)

          On October 31, 1994, the Decatur Herald circulated a

Crime Stoppers' flyer as an insert in its daily paper.  The flyer

(appended to this opinion), captioned "Most Wanted Fugitives,"

featured plaintiff's name, picture, and the charge for which he

was wanted, along with similar information concerning others

wanted on outstanding warrants.  Textual information appears to

the right of the pictures, including (1) the prefatory statement

"Fugitives featured in this publication are wanted as of October

6, 1994.  Warrants must be verified before arrest"; (2) a warning

("IMPORTANT: These fugitives should be considered dangerous and

might possibly be armed"); and (3) the credited source of the

information ("This is an official quarterly publication compiled

by the Macon County Sheriff's Warrants and Extradition Division

with aid from local and state police agencies").  While the par-

ties at oral argument were unable to explain who actually format-

ted and published the flyer, plaintiff's complaint alleged only

that "the Macon County Sheriff's Department printed and distrib-

uted over 50,000 copies of the flyer" to be added as an insert in

the Decatur Herald.  TCI made and aired a television segment

based on the flyer.

   II.  ANALYSIS

          The material in this section is not to be published

pursuant to Supreme Court Rule 23.  Official Reports Advance

Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994.

          Although it is somewhat unclear from his brief, plain-

tiff appears to challenge three separate defamatory statements in

the flyer.  First, plaintiff asserts as defamatory the statement

that, as of October 6, 1994, a warrant existed for his arrest in

connection with a charge of burglary to a motor vehicle.  Second,

he asserts as defamatory the heading of the flyer, "Most Wanted

Fugitives."  Third, he seems to allege that the warning inside

the box on the right side of the flyer, stating "[t]hese fugi-

tives should be considered dangerous and might possibly be

armed," defames him.  We consider all three statements in review-

ing the trial court's decision.

A.  Truth and Protected Opinion as a Defense

          The material in this section is not to be published

pursuant to Supreme Court Rule 23.

B.  Defense of Substantial Truth

          Defendants contend that the trial court's decision was

proper because the flyer's statements were substantially true. 

We agree.

          In Illinois, an allegedly defamatory statement is not

actionable if it is substantially true, even though it is not

technically accurate in every detail.  Farnsworth v. Tribune Co.,

43 Ill. 2d 286, 293, 253 N.E.2d 408, 412 (1969); Lemons v.

Chronicle Publishing Co., 253 Ill. App. 3d 888, 890, 625 N.E.2d

789, 791 (1993).  While this rule is rooted in the United States

Constitution (see New York Times Co. v. Sullivan, 376 U.S. 254,

289, 11 L. Ed. 2d 686, 712, 84 S. Ct. 710, 731 (1964) (suggesting

that state law requiring literal and complete truth as a defense

might violate the first amendment); Masson v. New Yorker Maga-

zine, Inc., 501 U.S. 496, 115 L. Ed. 2d 447, 111 S. Ct. 2419

(1991) (only substantial truth, not literal truth, is required in

defense of a defamation action)), it is also logically driven, as

"falsehoods which do no incremental damage to the plaintiff's

reputation do not injure the only interest that the law of

defamation protects."  (Emphasis in original.)  Haynes v. Alfred

A. Knopf, Inc., 8 F.3d 1222, 1228 (7th Cir. 1993).  Moreover,

"[a] fussy insistence upon literal accuracy 'would condemn the

press to an arid, dessicated [sic] recital of bare facts.'"  Loeb

v. Globe Newspaper Co., 489 F. Supp. 481, 486 (D. Mass. 1980),

quoting Time, Inc. v. Johnston, 448 F.2d 378, 384 (4th Cir.

1971).  

          A defendant bears the burden of establishing the "sub-

stantial truth" of his assertions, which he can demonstrate by

showing that the "gist" or "sting" of the defamatory material is

true.  Lemons, 253 Ill. App. 3d at 890, 625 N.E.2d at 791.  When

determining the "gist" or "sting" of allegedly defamatory materi-

al, a trial court must "look at the highlight of the article, the

pertinent angle of it, and not to items of secondary importance

which are inoffensive details, immaterial to the truth of the

defamatory statement."  Vachet v. Central Newspapers, Inc., 816

F.2d 313, 316 (7th Cir. 1987).  While substantial truth is

normally a question for the jury, where no reasonable jury could

find that substantial truth had not been established, the ques-

tion is properly one of law, which this court may review de novo. 

See Haynes, 8 F.3d at 1228.  

          Here, the essence of the matter is that plaintiff was

wanted on an arrest warrant as of October 6, 1994, for burglary

to a motor vehicle, which is entirely true.  That plaintiff

"might possibly be armed" or "should be considered dangerous" or

was a "most wanted" fugitive--to the extent the statements can

even be considered as applying to plaintiff or asserting facts

about him--are all secondary details, immaterial to the truth of

the Crime Stoppers flyer.  Viewing the three allegedly defamatory

statements under the totality of the circumstances, we conclude

that the trial court's decision was also proper in light of the

"substantial truth" of the flyer.  

          Our conclusion squares with similar results reached by

this court and other courts in similar circumstances.  See, e.g.,

Lemons, 253 Ill. App. 3d at 890, 625 N.E.2d at 791 (where the

plaintiff was caught shoplifting by store employees and then

pulled a knife, newspaper article's statements that employees

were "security guards," the plaintiff was convicted of four

rather than three offenses, and one employee was "stabbed" as

opposed to cutting himself in trying to disarm the plaintiff were

of little relevance); Haynes, 8 F.3d 1222 (where the plaintiff

admitted or it was incontestably established that he drank heavi-

ly, lost his job, assaulted a police officer, walked out on his

children, and committed bigamy, statements that the plaintiff

left his children home alone on some nights, was fired for

drinking rather than for being caught with alcohol, and preferred

to spend money on his car rather than his children paled by

comparison); Vachet, 816 F.2d 313 (where the plaintiff admitted

being arrested for harboring a fugitive, whether the plaintiff

was arrested on a warrant for that charge was an irrelevant

detail); Wilson, 343 Ill. App. 238, 98 N.E.2d 391 ("gist" or

"sting" of a report of a supreme court decision was that the

plaintiff, after having been convicted, was granted a new trial,

and the newspaper's report that the plaintiff had begun to serve

his sentence was immaterial).  

                              C.  Privileges

                    1.  Absolute Privilege as a Defense

          The material in this section is not to be published

pursuant to Supreme Court Rule 23.

2.  Conditional Privileges

          The Decatur Herald and TCI both assert they were pro-

tected by a conditional privilege.  We agree.

          In Kuwik v. Starmark Star Marketing & Administration,

Inc., 156 Ill. 2d 16, 27, 619 N.E.2d 129, 134 (1993), our supreme

court adopted the Restatement (Second) of Torts approach to

determine whether a qualified privilege should be recognized in a

given situation.  See Restatement (Second) of Torts §§593 through

599 (1977).  Conditional privileges generally fall into three

categories: (1) situations which involve some interest of the

person who publishes the defamatory matter; (2) situations which

involve some interest of the person to whom the matter is pub-

lished or of some third person; and (3) situations which involve

a recognized interest of the public.  Kuwik, 156 Ill. 2d at 29,

619 N.E.2d at 135.  A court should look only to the occasion

giving rise to the defamation action when determining as a matter

of public policy whether the occasion created some recognized

duty or interest which makes communication of the defamatory

statement in that situation conditionally privileged as a matter

of law.  Kuwik, 156 Ill. 2d at 27, 619 N.E.2d at 134; see Quinn

v. Jewel Food Stores, Inc., 276 Ill. App. 3d 861, 871, 658 N.E.2d

1225, 1233 (1995); Barakat v. Matz, 271 Ill. App. 3d 662, 668,

648 N.E.2d 1033, 1039 (1995).  The defendant bears the burden of

demonstrating the existence of a conditional privilege.  Kuwik,

156 Ill. 2d at 27, 619 N.E.2d at 134.

          Here both defendants were protected by a conditional

privilege.  The publication of the Crime Stoppers flyer was

conditionally privileged under category three, as a situation

which involved a recognized interest of the public.  Section 598

of the Restatement (Second) of Torts, entitled "Communication to

One Who May Act in the Public Interest," sets forth this privi-

lege:

          "An occasion makes a publication conditional-

          ly privileged if the circumstances induce a

          correct or reasonable belief that

               (a) there is information that affects a

          sufficiently important public interest, and 

               (b) the public interest requires the

          communication of the defamatory matter to a

          public officer or a private citizen who is

          authorized or privileged to take action if

          the defamatory matter is true."  Restatement

          (Second) of Torts §598, at 281 (1977).  

Comments d and f to section 598 of the Restatement (Second) of

Torts compel recognition of a conditional privilege for the type

of publication at issue in this case.  Comment d states, "[t]he

rule stated in this Section is applicable when any recognized

interest of the public is in danger, including the interest in

the prevention of crime and the apprehension of criminals." 

(Emphasis added.)  Restatement (Second) of Torts §598, comment d,

at 282-83 (1977).  Comment f, entitled "Communications to private

citizen to prevent crime or apprehend criminal," states:

          "The privilege stated in this Section affords

          protection to a private citizen who publishes

          defamatory matter to a third person even

          though he is not a law enforcement officer,

          under circumstances which, if true, would

          give to the recipient a privilege to act for

          the purpose of preventing a crime or of ap-

          prehending a criminal or fugitive from jus-

          tice."  (Emphasis added.)  Restatement (Sec-

          ond) of Torts §566, comment f, at 283-84

          (1977).

In light of these comments to the Restatement, we hold that the

trial court correctly concluded defendants' publications were

conditionally privileged.

          However, a determination that a qualified privilege

exists does not end the inquiry.  If a defendant demonstrates the

existence of a qualified privilege, the burden then shifts to the

plaintiff to demonstrate abuse of the privilege.  Quinn, 276 Ill.

App. 3d at 871, 658 N.E.2d at 1234.  Prior to the adoption of the

Restatement approach to conditional privileges, a plaintiff could

establish abuse of a qualified privilege only by a showing of

actual malice, i.e., showing defendant knew the statement to be

false or acted in reckless disregard to the truth or falsity of

the statement.  Zeinfeld v. Hayes Freight Lines, Inc., 41 Ill. 2d

345, 349-50, 243 N.E.2d 217, 221 (1968).  Following the adoption

of the Restatement (Second) approach, a plaintiff could addition-

ally establish abuse by showing "any reckless act which shows a

disregard for the defamed party's rights, including the failure

to properly investigate the truth of the matter, limit the scope

of the material, or send the material to only the proper par-

ties."  Kuwik, 156 Ill. 2d at 30, 619 N.E.2d at 136.

          Here, the plaintiff has failed to demonstrate how

either defendant abused its conditional privilege.  Plaintiff set

forth no facts tending to show either of the defendants acted in

bad faith in circulating the flyer.  According to the allegations

in the plaintiff's complaint, the sheriff's department printed

and distributed the flyer to be inserted in the Decatur Herald,

which in turn reasonably relied on the sheriff's department as a

source of the compilation.  The defendants cannot be expected to

verify the existence of each individual outstanding warrant for

all fugitives pictured on these flyers; such time-consuming

verification procedures would greatly reduce the effectiveness

and timeliness of these flyers.  The flyer at issue here was

limited in its scope; the flyer simply stated that plaintiff was

wanted on an outstanding arrest warrant as of October 6, 1994,

and noted the charge on which the warrant was based.  Further,

the timing of the publication was proper because it occurred not

long after the most current information was compiled by the

sheriff's department.  Last, plaintiff's complaint alleges

nothing improper regarding the manner in which the communication

was made (as an insert in the newspaper), and, given that such

programs depend upon the widest possible circulation for their

success, it was proper for the public at large to receive the

communication.

                3.  Privilege of Fair and Accurate Summary

          Defendants were additionally protected by the privilege

which protects fair and accurate summaries of governmental pro-

ceedings.  Our supreme court first recognized this privilege in

Lulay v. Peoria Journal-Star, Inc., 34 Ill. 2d 112, 114-15, 214

N.E.2d 746, 747-48 (1966), which adopted the definition of this

privilege as set forth in the first Restatement of Torts:

               "The publication of a report of judicial

          proceedings, or proceeding of a legislative

          or administrative body or an executive offi-

          cer *** or a municipal corporation or of a

          body empowered by law to perform a public

          duty is privileged, although it contains

          matter which is false and defamatory, if it

          is 

               (a) accurate and complete or a fair

               abridgment of such proceedings, and

               (b) not made solely for the purpose

               of causing harm to the person de-

               famed."  Restatement of Torts §611,

               at 293 (1938).

Thus, under Lulay, this privilege is qualified because a plain-

tiff can defeat it by showing that a defendant made a defamatory

statement in the course of reporting governmental proceedings but

did so with common law malice. 

          In Catalano v. Pechous, 83 Ill. 2d 146, 167-68, 419

N.E.2d 350, 360-61 (1980), the supreme court modified this privi-

lege in accordance with the Restatement (Second) of Torts. 

Section 611 of the Restatement (Second) of Torts dropped part (b)

from the above definition, and, in a sense, created a "hybrid"

privilege:  "conditional" in that only those reports of govern-

mental proceedings which are accurate and complete or fair

abridgments of the proceedings are privileged; "absolute" in that

once the prerequisites of the privilege are met, the privilege

cannot be defeated by a showing of malice.  See Restatement (Sec-

ond) of Torts §611, comments a, b, at 297-98 (1977).  Section 611

of the Restatement (Second) of Torts provides as follows:

          "The publication of defamatory matter con-

          cerning another in a report of an official

          action or proceeding *** is privileged if the

          report is accurate and complete or a fair

          abridgement of the occurrence reported."  Re-

          statement (Second) of Torts §611, at 297

          (1977).

          Thus, under the Restatement (Second) approach, actual

or common law malice will not defeat the privilege once the

prerequisites of the privilege have been met.  After noting the

privilege is not absolute but "broader in its scope" than tradi-

tional qualified privileges, the Restatement (Second) stresses

"the interest of the public in having information made available

to it as to what occurs in official proceedings and public

meetings."  Restatement (Second) of Torts §611, comment a, at 297

(1977).  The accuracy of the summary, not the truth or falsity of

the information being summarized, is the benchmark of the privi-

lege, because the one reporting on the proceeding or meeting is

simply acting as the public eye, reporting information "that any

member of the public could have acquired for himself."  Restate-

ment (Second) of Torts §611, comment i, at 301 (1977); see also

Martin v. State Journal-Register, 244 Ill. App. 3d 955, 965, 612

N.E.2d 1357, 1364 (1993) (noting reporters "serve as conduits

through which information flows from the reporters' sources to

the public"); W. Keeton, Prosser & Keeton on Torts §115, at 836

(5th ed. 1984) (the rationale underlying the privilege is that

"any member of the public, if he were present, might see and hear

for himself [what is contained in a governmental report or stated

in governmental proceedings], so that the reporter is merely a

substitute for the public eye").  

          In discussing why malice no longer defeats the privi-

lege, the Restatement (Second) of Torts comments:

          "The privilege *** permits a person to pub-

          lish a report of an official action or pro-

          ceeding ***, even though the report contains

          what he knows to be a false and defamatory

          statement.  The constitutional requirement of

          fault is met in this situation by a showing

          of fault in failing to do what is reasonably

          necessary to insure that the report is accu-

          rate and complete or a fair abridgment."  Re-

          statement (Second) of Torts §611, comment b,

          at 298 (1977).

          Despite these comments to the Restatement (Second) of

Torts, Catalano appears to have caused confusion in the appellate

courts as to whether actual malice might still be raised to

defeat this privilege.  See Brown & Williamson Tobacco Corp. v.

Jacobson, 713 F.2d 262, 272 (7th Cir. 1983) ("Illinois law is in

disarray on the question whether actual malice defeats the

privilege of fair summary"); Berkos v. National Broadcasting Co.,

161 Ill. App. 3d 476, 493, 515 N.E.2d 668, 678 (1987) (citing a

variety of appellate court cases reaching opposite conclusions on

the issue); Note, Reports upon Public Proceedings and Documents: 

Absolutely Protected by Constitutional Privilege, 1985 U. Ill. L.

Rev. 1059, 1080-83 (1985) (discussing and criticizing post-

Catalano cases permitting a showing of actual malice to overcome

the privilege).  However, decisions of the United States Supreme

Court suggest that a constitutional barrier prevents actual

malice from overcoming the privilege.  See Cox Broadcasting Corp.

v. Cohn, 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975)

(imposition of liability for the "accurate publication" by the

press of information lawfully obtained and available in the

public record would be inconsistent with the first and fourteenth

amendments); Smith v. Daily Mail Publishing Co., 443 U.S. 97,

103, 61 L. Ed. 2d 399, 405, 99 S. Ct. 2667, 2671 (1979) ("[I]f a

newspaper lawfully obtains truthful information about a matter of

public significance then state officials may not constitutionally

punish publication of the information, absent a need *** of the

highest order").  Moreover, other decisions support the conclu-

sion that it is the accuracy of the press' report--the degree to

which it tracks the material contained in the public record--and

not the underlying truth or falsity of the public record itself

which forms the basis of the privilege and renders notions of

actual malice irrelevant.  See Cox, 420 U.S. at 492, 43 L. Ed. 2d

at 347, 95 S. Ct. at 1044 (noting the responsibility of the news

media "to report fully and accurately the proceedings of govern-

ment"); Florida Star v. B.J.F., 491 U.S. 524, 539, 105 L. Ed. 2d

443, 459, 109 S. Ct. 2603, 2612 (1989) (holding that a newspaper

may not be punished for the publication of the name of a rape

victim where the name was lawfully obtained from a sheriff's

department release and noting that had the defendant newspaper

"merely reproduced the news release prepared and released by the

[Sheriff's] Department, imposing civil damages would surely

violate the First Amendment"); Time, Inc. v. Firestone, 424 U.S.

448, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976) (inaccurate summari-

zations of public proceedings not protected under Cox); Mathis v.

Philadelphia Newspapers, Inc., 455 F. Supp. 406, 417 (E.D. Pa.

1978) (for privilege to apply, court must compare complained-of

publications not with the events which actually transpired but

with what was actually stated in the governmental proceeding or

report); O'Donnell v. Field Enterprises, Inc., 145 Ill. App. 3d

1032, 1035-36, 491 N.E.2d 1212, 1215 (1986) (finding privilege

applies even where publisher knows statements he is reporting are

false); Martin, 244 Ill. App. 3d at 965, 612 N.E.2d at 1364

(noting "reporters do not and cannot guarantee the truth of their

stories; instead, they serve as conduits through which informa-

tion flows from the reporters' sources to the public" (emphasis

in original)).  This approach makes sense because the privilege

is circumscribed by definition--one must either make a complete

and accurate report, or, if a summary is made, the summary must

be "fair" for the privilege to apply.

          With these principles in mind, it is clear that the

fair summary privilege protects the defendants in the present

case because they accurately published information obtainable

through public records.  An outstanding warrant for plaintiff's

arrest did exist as of October 6, 1994.  The existence of an

arrest warrant is a matter of public record and inherently

involves some official action by the judiciary.  The flyer was

complete and accurate in reporting plaintiff's fugitive status as

of October 6, 1994.  Even were it not, as discussed above, the

flyer was beyond a doubt substantially true, making the privilege

applicable.  See Restatement (Second) of Torts §611, comment f,

at 300 (1977) ("substantially correct account of the proceedings"

is all that is required to invoke the privilege).

          In support of our conclusion, we note that other courts

have found this privilege applicable under very similar circum-

stances.  In Mathis (455 F. Supp. at 409), two allegedly libelous

newspaper articles described the arrest and arraignment of two

brothers for kidnapping and bank robbery.  Both articles errone-

ously pictured the plaintiff as one of the two suspects, but the

erroneous picture was supplied by the Philadelphia police depart-

ment.  The second article contained a further error.  In describ-

ing the second arrestee (who had the same name as the plaintiff

and in whose place plaintiff's picture appeared), the article

gave, as the supposed age and address of the suspect, the age and

address of the plaintiff, again based on information supplied by

the police.  Although neither article credited law enforcement as

the source of the information, the misinformation was compiled by

the "night command," the official source of information regarding

the activities of Philadelphia detectives.  Mathis, 455 F. Supp.

at 416.  The Mathis court concluded that the police had issued an

"informal report" to the press involving the suspects, such that

the privilege set out under section 611 of the Restatement

(Second) of Torts applied.  Comparing the articles with the

"informal report" supplied by the police, the court found that

the articles were "accurate" and that the privilege could not

have been forfeited by simple negligence in failing to discover

the truth of the information.  Mathis, 455 F. Supp. at 416-17.

          Likewise, in Porter v. Guam Publications, Inc., 643

F.2d 615 (9th Cir. 1981), the "Police Blotter" section of

defendant's newspaper accurately reported, based on a police

compilation of criminal complaint and arrest reports, that the

plaintiff had been arrested and booked for theft of a motor

vehicle and some cash.  While true, the police bulletin itself

was based on false charges filed by the complainant, and no

complaint or arrest warrant was ever issued.  Porter, 643 F.2d at

616.  The Porter court reversed a jury verdict in favor of the

plaintiff, concluding that defendant's motion for summary judg-

ment should have been granted based on Guam's statutory privilege

for "fair and true" reports of "judicial" or "other public

official" proceedings.  Porter, 643 F.2d 617-18.  

4.  Privilege of Neutral Reportage

          Both defendants here were also protected by the privi-

lege of neutral reportage, which this court adopted in Krauss v.

Champaign News Gazette, Inc., 59 Ill. App. 3d 745, 747, 375

N.E.2d 1362, 1363 (1978).  The Krauss court, relying on the

decision in Edwards v. National Audubon Society, Inc., 556 F.2d

113 (2d Cir. 1977), summarized the privilege as follows:

          "[T]he doctrine of neutral reportage gives

          bent to a privilege by the terms of which the

          press can publish items of information relat-

          ing to public issues, personalities, or pro-

          grams which need not be literally accurate. 

          If the journalist believes, reasonably and in

          good faith, that his story accurately conveys

          information asserted about a personality or a

          program, and such assertion is made under

          circumstances wherein the mere assertion is,

          in fact, newsworthy, then he need inquire no

          further.  Unless it is shown that the jour-

          nalist deliberately distorts these statements

          to launch a personal attack of his own upon

          the public figure or the program, that which

          he reports under such circumstance is privi-

          leged."  Krauss, 59 Ill. App. 3d at 747, 375

          N.E.2d at 1363.

          Although the first district has refused to recognize

the privilege (see Newell v. Field Enterprises, Inc., 91 Ill.

App. 3d 735, 757-58, 415 N.E.2d 434, 451-52 (1980); Tunney, 109

Ill. App. 3d at 777-78, 441 N.E.2d at 92), other courts have done

so.  See, e.g., Edwards, 556 F.2d 113; Cianci v. New Times

Publishing Co., 639 F.2d 54 (2d Cir. 1980); Price v. Viking Pen-

guin, Inc., 881 F.2d 1426 (8th Cir. 1989), cert. denied, 493 U.S.

1036, 107 L. Ed. 2d 774, 110 S. Ct. 757 (1990); Ryan v. Herald

Ass'n, Inc., 152 Vt. 275, 566 A.2d 1316 (1989); Burns v. Times

Argus Ass'n, Inc., 139 Vt. 381, 430 A.2d 773 (1981) (citing

privilege with approval in dicta); Herron v. Tribune Publishing

Co., 108 Wash. 2d 162, 736 P.2d 249 (1987) (en banc); Barry v.

Time, Inc., 584 F. Supp. 1110 (N.D. Cal. 1984); Sunshine Sports-

wear & Electronics, Inc. v. WSOC Television, Inc., 738 F. Supp.

1499 (D. S.C. 1989); see also Comment, Neutral Reportage: The

Case for a Statutory Privilege, 86 Nw. U. L. Rev. 417 (1992)

(hereinafter Comment); cf. Harte-Hanks Communications, Inc. v.

Connaughton, 491 U.S. 657, 694, 105 L. Ed. 2d 562, 593, 109 S.

Ct. 2678, 2699 (1989) (Blackmun, J., concurring) (petitioner's

failure to assert neutral reportage privilege "unwise"); contra,

e.g., Dickey v. CBS, Inc., 583 F.2d 1221 (3d Cir. 1978); Janklow

v. Viking Press, 378 N.W.2d 875 (S.D. 1985).  Our supreme court

has not yet addressed this privilege.  See Catalano, 83 Ill. 2d

at 170, 419 N.E.2d at 362.  We renew our acceptance of the

privilege and conclude that it applies here.  We note that

plaintiff's complaint contains no assertion that the defendants

abused this privilege in the instant matter. 

D.  The Innocent Construction Rule

          The material in this section is not to be published

pursuant to Supreme Court Rule 23.

  III.  EPILOGUE

          The fear of libel litigation alone is potentially a

greater threat to freedom of speech than the actual litigation. 

See Costello v. Ocean County Observer, 136 N.J. 594, 605, 643

A.2d 1012, 1018 (1994).  As long ago as 1984, Judge Bork noted,

"[A] remarkable upsurge in libel actions, accompanied by a

startling inflation of damage awards, has threatened to impose a

self-censorship on the press which can as effectively inhibit

debate and criticism as would overt governmental regulation that

the first amendment most certainly would not permit."  Ollman v.

Evans, 750 F.2d 970, 996 (D.C. Cir. 1984) (en banc) (Bork, J.,

concurring, joined by Wilkey, Ginsburg, and MacKinnon, JJ.). 

While only 10% of libel plaintiffs win their cases, the average

monetary judgments against media defendants in these winning

cases is a frightening $2 million.  Comment, 86 Nw. U. L. Rev. at

444 & n.200 (describing the case of the Alton Telegraph, an Illi-

nois daily newspaper with 35,000 subscribers, which, after having

lost a $9.2 million libel suit based on an article which was

never published, threatened bankruptcy, settled, and was eventu-

ally sold).  Thus, motions for summary judgment and like motions

are exceedingly important tools for disposing of nonmeritorious

defamation suits.  Costello, 136 N.J. at 605, 643 A.2d at 1018;

see, e.g., Porter, 643 F.2d 615 (jury award of $25,000 in

plaintiff's favor in libel action reversed because the

defendant's motion for summary judgment should have been grant-

ed).  Again, as Judge Bork notes, "The only solution to the

problem libel actions pose would appear to be close judicial

scrutiny to ensure that cases about types of speech and writing

essential to a vigorous first amendment do not reach the jury." 

Ollman, 750 F.2d at 996 (Bork, J., concurring, joined by Wilkey,

Ginsburg, and MacKinnon, JJ.); see also Costello v. Capital

Cities Communications, Inc., 153 Ill. App. 3d 956, 993, 505

N.E.2d 701, 724 (1987) (Steigmann, J., dissenting) (because of

danger to first amendment freedoms presented by libel suits,

courts must act with "heightened awareness" when ruling in this

area).  While the writing at issue here was not political speech

often thought to be at the core of the first amendment, the media

in this type of situation nevertheless perform an invaluable

service to both law enforcement and the public at large.  Accord-

ingly, we conclude that the trial court's grant of defendants'

motions to dismiss in the present case was absolutely proper.

                              IV. CONCLUSION

          For the reasons stated, we affirm the trial court's

judgment.

          Affirmed.

          COOK, P.J., and KNECHT, J., concur.